Kendra L. CHAMNESS, a minor By and Through her parent and next friend, Joy CHAMNESS; and Joy Chamness, individually, Plaintiffs–Appellants,

v.

UNITED STATES of America, Defendant–Appellee.

No. 86–5905.

United States Court of Appeals, Eleventh Circuit.

Jan. 19, 1988.

Joel S. Perwin, Podhurst, Orseck, Parks, Josefsberg, Eaton, Meadow & Olin, P.A., Spence, Payne, Masington, Grossman & Needle, P.A., Stuart Z. Grossman, Miami, Fla., for plaintiffs-appellants.

Leon B. Kellner, U.S. Atty., David H. Lichter, Linda Collins Hertz, Asst. U.S. Attys., Miami, Fla., for defendant-appellee.

---

Before JOHNSON and ANDERSON, Circuit Judges, and ATKINS *, Senior District Judge.

JOHNSON, Circuit Judge:

In this medical malpractice suit, the district court granted summary judgment to the United States on the basis that the plaintiffs' claim is time barred by the two-year statute of limitations applicable to the Federal Tort Claims Act. We reverse and remand.

## I. FACTS

Kendra Chamness was born in the Malcolm Grow Medical Center at Andrews Air Force Base on November 10, 1980. The delivery lasted over twenty-nine hours and was complicated by fetal distress. Kendra had a dangerously high heart rate during most of the delivery. Mrs. Chamness periodically saw the rising heart rate on the fetal monitor,[1] and Mr. Chamness sat in the delivery room where he could see the monitor the entire time. Mrs. Chamness also received warnings that Kendra could be experiencing a lack of oxygen. Dr. Mary Jewell urged Mrs. Chamness to calm down and stop pushing so hard. Because Mrs. Chamness failed to relax on her own, Dr. Jewell first gave Mrs. Chamness Nisentil and then Phenergan.

The drugs sufficed to put Mrs. Chamness to sleep and her labor contractions ceased. The baby was still in fetal distress when Mrs. Chamness awoke. She asked about the possibility of a Caesarean section. Dr. Jewell knew that a baby in fetal distress should be delivered immediately. In consultation with the overseeing obstetrician, Dr. Jewell instead chose to administer Pitocin, a drug intended to intensify labor contractions.

More than a day later when the baby was first brought to her, Mrs. Chamness learned that Kendra had been born with tachycardia (high heart rate), an elevated temperature, and jitteriness. As Kendra grew older, she showed additional signs that something was wrong: she threw up a lot, slept too much, did not suck well, and appeared to be developmentally delayed.

In March 1981, Dr. Morales, a consulting pediatrician, was unable to give a full prognosis. Eight months after birth in July 1981, based on a CAT scan, Dr. Morales informed Mrs. Chamness that Kendra had a Dandy–Walker cyst, which meant the cerebellum was surrounded by spinal fluid and in a premature state of growth. Dr. Morales linked the cyst to cerebral palsy and spastic quadriplegia, as an explanation of Kendra's shaking. Dr. Morales also diagnosed Kendra as having microcephaly (smallness of the head). Sixteen months after birth in April 1982, Dr. Morales officially diagnosed Kendra as "profoundly mentally retarded." Dr. Morales did not link the mental retardation to the cyst or microcephaly.

Mrs. Chamness consulted additional doctors, including Dr. Koker, a neurologist, and Dr. Tuware, a geneticist. Like Dr. Morales, these doctors could not explain the source of the cyst. Neither doctor linked the occurrence of a Dandy–Walker cyst to mental retardation, nor the microcephaly to the cyst, nor the microcephaly to mental retardation.[2]

---

* Honorable C. Clyde Atkins, Senior U.S. District Judge for the Southern District of Florida, sitting by designation.

1. Mrs. Chamness is a nurse by profession, although her specialty is cardiac care. Her early training exposed her to the delivery room for two weeks as part of a normal rotation. She has stated that although she could read a cardiac monitor, she could not interpret a fetal monitor. Although the parties dispute the extent of her medical knowledge, for the purposes of reviewing this summary judgment, we accept her denial of special expertise in obstetrics as true.

2. Throughout this time most of Kendra's medical records, not including the delivery records, were being handcarried by Mrs. Chamness. Mrs. Chamness tried to obtain the delivery records for Dr. Morales in 1981. She did not personally receive those records and did not know if they had been made available to Dr. Morales. Mrs. Chamness again requested and this time received the delivery records in 1984. Nonetheless, even without the records, Mrs. Chamness knew the drugs she had been given during labor and recounted those facts of the birth to each of the doctors who diagnosed Kendra.

In August 1983, a new doctor, Dr. Cullen, promised to investigate Kendra and take new CAT scans. In December 1983, Mrs. Chamness learned on the television program 20/20 that Nisentil, which had been recalled by the FDA in 1980, was contraindicated during labor and delivery. Mrs. Chamness gave Dr. Cullen a copy of the 20/20 transcript. Sometime thereafter Dr. Cullen gave his medical opinion that the mental retardation was a product neither of the Dandy–Walker cyst nor of heredity, but probably of an insult injury during delivery. Dr. Cullen's opinion led to this suit, based on the theory that severe contractions induced by Pitocin caused Kendra to be compressed and deprived of oxygen in the birth canal.[3] By the time of trial, Kendra (age five) had the abilities of a four-month old baby.

## II. DISCUSSION

As part of the Federal Tort Claims Act,[4] Congress created a two-year exception to traditional government immunity from damages to individuals for tort claims.[5] The language of the Act does not qualify the exception in any way, and the legislative history indicates that Congress intended the point of accrual for a cause of action to be the time of the injury. *See United States v. Kubrick*, 444 U.S. 111, 119–21, 100 S.Ct. 352, 357–59, 62 L.Ed.2d 259 (1979). However, courts have themselves carved out an exception to the statutory exception. Medical malpractice suits have been conditioned by the exercise of due diligence by those injured. In *Kubrick*, information from a private physician that it was "highly possible" that Kubrick's hearing loss had been caused by neomycin sufficed to run the statute of limitations. 444

U.S. at 114, 100 S.Ct. at 355. This Circuit in *Price v. United States*, 775 F.2d 1491, 1493 (11th Cir.1985) (surgery removing uterus also proved fatal to undetected fetus), held that "[o]nce the plaintiff discovers that her injury is probably attributable to some act of those who treated her, there is no longer any reason to toll the statute of limitations."[6]

There is no dispute in this case that Mrs. Chamness was fully aware that her daughter was impaired. The problematic delivery was the first sign of injury, followed by additional symptoms and medical diagnoses of injury. Knowledge of cause is less clear in this case. Mrs. Chamness knew that she was having difficulty delivering her baby. She also knew that she was given Nisentil, Phenergan, and Pitocin to assist in the delivery. She knew that the decision to administer the drugs had been difficult for the doctors involved.

The district court found that "once Joy Chamness knew of Kendra's [developmentally impaired] condition in July 1981, she was armed with sufficient knowledge to pursue advice in the medical and legal community." Mrs. Chamness sought such advice. The district court found that three doctors consulted by Mrs. Chamness told her that the retardation was caused by neither the Dandy–Walker cyst, nor a hereditary or genetic dysfunction, nor an insult injury during labor and delivery, nor any incident after birth. Not one of the three doctors knew the specific cause of the mental retardation, and all concluded Kendra was a "statistical aberration." Thus the knowledge that Mrs. Chamness had received Pitocin did not encompass knowing that Pitocin given in conjunction

---

**3.** The 20/20 documentary discussed Nisentil, but it was Dr. Cullen's opinion that Pitocin was contraindicated during Mrs. Chamness' labor. It appears that the 20/20 program was instrumental in focusing Mrs. Chamness on the general possibility of insult injury arising from drugs administered during labor.

**4.** Pub.L. No. 601, 60 Stat. 812 (codified as amended in scattered sections of 28 U.S.C. (1976 & Supp.1987)).

**5.** 28 U.S.C.A. § 2401(b) states:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

**6.** "At this point, the plaintiff is no longer at the mercy of those who caused the injury." *Price*, 755 F.2d at 1494.

with such delivery circumstances as hers could injure a fetus. As Mrs. Chamness claims, it was not until thirty-seven months after birth, when the connection was made for her on a 20/20 television program, that she was alerted to the possibility that Pitocin might have caused injury to her daughter. Only then did she discover that Kendra's mental retardation was "probably attributable" to the drugs taken during labor.[7] *Price,* 775 F.2d at 1493.

The FTCA statute is not tolled by ignorance from a lack of diligence. However, a number of post-*Kubrick* cases have stressed that plaintiffs seeking to understand the cause of an injury may reasonably rely on advice and assurances by doctors.[8] The Ninth Circuit has asserted: "Ordinarily, a plaintiff cannot be expected to discover the general medical cause of his injury even before the doctors themselves are able to do so." *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987) (cause did not accrue where doctor was unable to diagnose retardation and did not mention IUD as possible source of injury).

This is a difficult case. Mrs. Chamness was not given reasonable or credible explanations as to the cause of Kendra's injury on which to rely. She was given no explanation. No doctor actively misled or lulled Mrs. Chamness into an erroneous belief about the cause of injury. But nei-

ther did the 20/20 show explain the cause. Instead, it triggered the suspicion that drugs administered during labor created permanent damage. Mrs. Chamness arguably had enough facts from the circumstances of the delivery to draw the same conclusions before the 20/20 show as after.

The district court opinion held that *Kubrick* bars this claim because erroneous or inconclusive advice from doctors does not toll the statute of limitations. We disagree and hold that this case is distinguishable from *Kubrick* in that Mrs. Chamness was still unknowledgeable about the *cause* of Kendra's injury.[9]

### III. CONCLUSION

This case was not ripe for summary judgment. Mrs. Chamness was not "aware of both injury and its connection with some act of the defendant," *Price,* 775 F.2d at 1494, until the 20/20 show and the fourth doctor's diagnosis. However, genuine and material factual issues remain as to whether Mrs. Chamness exercised due diligence in uncovering the causal connection and whether the injury was caused by the negligence of the agents of the government during the course of the birth.

**REVERSED and REMANDED.**

---

7. This case is different from *Price* because Mrs. Chamness was in a position of needing to ask medical experts about the cause of the injury of the mental retardation. By contrast, it was obvious to Price that those removing her uterus had caused the death of her fetus.

This case is also different from *Kubrick* because Mrs. Chamness asked doctors about the cause but received no answers explaining the cause. By contrast, Kubrick had been informed that neomycin was the cause of his injury. That information sufficed as a basis from which to ascertain negligent treatment.

8. *See, e.g., Otto v. National Institute of Health,* 815 F.2d 985, 989 (4th Cir.1987) (cause did not accrue because doctors gave plaintiff "reasonable and credible explanations for the procedure and the complications that ensued"); *Nemmers v. United States,* 795 F.2d 628 (7th Cir. 1986) ("a 'layman's subjective belief' in a cause does not start the statute when a competent medical professional would disagree with the belief"); *Nicolazzo v. United States,* 786 F.2d 454

(1st Cir.1986) (merits of claim depend on whether plaintiff only learned of injury late because second doctor was competent and first was not); *Raddatz v. United States,* 750 F.2d 791, 796 (9th Cir.1984) (acceptable reliance on erroneous statement that she only had side effects, not symptoms of inflammatory disease). Reliance on medical opinion about the existence of an injury has also tolled the FTCA statute of limitations in this Circuit. *Burgess v. United States,* 744 F.2d 771, 775 (11th Cir.1984); *Ballew v. A.H. Robins Co.,* 688 F.2d 1325, 1328 (11th Cir.1982).

9. Additionally, any inference in the district court's opinion that the fortuity of the 20/20 show undermines plaintiffs' claim misses the issue of whether Mrs. Chamness exercised due diligence and reasonably relied on medical opinion. *In re Swine Flu Products Liability Litigation,* 764 F.2d 637, 641 (9th Cir.1985) (information from 60 Minutes TV program started statute); *Jastremski v. United States,* 737 F.2d 666, 668 (7th Cir.1984) (chance conversation at social party started statute).