**Joseph OSBORN and Pamela Osborn, as father and mother and guardians ad litem of Shawna Osborn, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. No. A2–86–160.**

United States District Court,
D. North Dakota,
Northeastern Division.

May 24, 1989.

Lembhard G. Howell, Seattle, Wash., Ambrose E. Stanley, Fairfield, Cal., for plaintiff.

Mary McElroy Leach, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Washington, D.C., Lynn E. Crooks, Asst. U.S. Atty., Gail K. Johnson, Trial Atty., Torts Branch, Civ. Div., U.S. Dept. of Justice, Fargo, N.D., for defendant.

## MEMORANDUM AND ORDER

BENSON, Senior District Judge.

This is a medical malpractice action against the United States, brought under the Federal Tort Claims Act. *See* 28 U.S.C. §§ 2671–2680. The minor plaintiff, Shawna Osborn, allegedly sustained severe injuries resulting from the administration of a diptheria, pertussis, and tetanus (DPT)[1] vaccination. The United States is a defendant because Shawna received the vaccination at a United States Air Force immunization clinic in Grand Forks, North Dakota.

The United States has filed a motion to dismiss[2] the case for lack of subject matter jurisdiction on the basis that the plaintiff failed to present a claim to the appropriate federal agency within two years of the accrual of the claim, as required by statute:

A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after

---

1. The parties refer to the vaccine as both DTP and DPT.

2. The United States captioned its motion as a "Motion for Summary Judgment." The court is construing this as a motion to dismiss for lack of subject matter jurisdiction. *See* F.R.Civ.P. 12(b)(1) and (h)(3); *Haley v. Childers,* 314 F.2d 610, 613 n. 2 (8th Cir.1963); *Dugan v. Ramsay,* 560 F.Supp. 1230, 1237 n. 11 (D.R.I.1983), *Rev'd on other grounds,* 727 F.2d 192 (1st Cir.1984; 5 C. Wright & A. Miller, Federal Practice and Procedure § 1350, at 547 (1969).

such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented. 28 U.S.C. § 2401(b). The plaintiff presented the claim to the United States Air Force on October 15, 1985. The vaccine was administered on December 7, 1982.

## FACTS

For purpose of the motion, the court assumes the truth of the following facts. Shawna was born March 18, 1981.[3] On June 22, 1981, she received the first of four DPT shots. The second and third shots were administered on August 24, 1981, and October 28, 1981.

On August 7, 1982, Shawna experienced a seizure episode and was seen at Grand Forks Air Force Base (GFAFB) hospital. Shawna had another seizure on September 14, 1982, and was admitted to the GFAFB hospital. On September 15, 1982, a GFAFB hospital nurse witnessed a third seizure. At that point, Shawna was diagnosed as having complex febrile seizures.[4] On October 12, 1982, Shawna underwent an EEG study by Dr. Ross E. Pettit, a private neurologist. The report was normal. On November 1, 1982, Shawna experienced two more febrile seizures and was again hospitalized.

On December 7, 1982, Shawna received a fourth DPT shot at the GFAFB immunization clinic. The shot was administered between 10:00 and 10:30 a.m. Between 11:00 and 11:30 a.m., Shawna experienced a non-febrile seizure. Her mother took Shawna to the GFAFB emergency room and was referred from there to the family practice. There the doctor found that she had apparently recovered from the seizure. Shawna was then taken home. At 12:00 noon, Shawna experienced a grand mal seizure.

In deposition Shawna's mother (Pamela Ann Osborn) described the seizure:

At about 12:00 o'clock she was lying on the couch asleep. She had a, what they call a full-blown grand mal where she arches her back, raises her arms, her face distorts, her eyes roll back in her head. She turns gray, and she proceeds to jerk and jump and make noises as she seizes.

[My husband] grabs her up, and we go back to the emergency room. We see somebody, I don't remember who. They can find nothing wrong, no ear infections, no fever, no fever with either seizure, no fever. Nothing.

Deposition of Pamela Ann Osborn, Vol. I at 126.

At about 7:00 p.m. that same day Shawna experienced a third seizure. Again, her mother described the seizure:

Early in the evening, about 7:00 P.M., Shawna and her dad are playing horsey in the hallway. She collapses to the floor in a seizure. We take her back to the emergency room. They put her in what they call the trauma room. She's on the examination table. She lies there, and she goes into what they call a petit mal seizure, at which time Dr. Billman witnesses the seizure.

She has no fever. They can find nothing else wrong with her. Dr. Erickstad checks her, fills out the emergency room report. We go home later. Those were the first seizures Shawna had with no fever.[5]

*Id.*

Following her non-febrile seizure on December 7, 1982, Shawna was seen by several physicians and was hospitalized on February 16–17, 1983; April 19–20, 1983; and June 20–29, 1983. On January 12, 1983, under the supervision of Dr. Pettit, she was given another EEG study and evalua-

3. The statute of limitations under 28 U.S.C. § 2401(b) is not tolled by Shawna's minority. *Smith v. United States,* 588 F.2d 1209, 1211 (8th Cir.1978). The parents or guardians of a minor must bring the action within the two year time period. *Jastremski v. United States,* 737 F.2d 666, 669 (7th Cir.1984).

4. A febrile seizure is a seizure accompanied by a fever. All of the seizures suffered prior to December 7, 1982, were febrile.

5. Plaintiff, at the oral hearing of this motion, waived a prior authenticity objection to these transcript passages.

tion. This time the report was abnormal. On May 6, 1983, Dr. Bruce Oskol advised Shawna's mother that Shawna was not to get any more DPT vaccine. Dr. Oskol's May 6, 1983 entry on the admission record reads: "Seizure Disorder Not to get any more DPT Vaccine (No pertussis)." Shawna's mother was provided with a copy of the immunization record. A subsequent EEG study and evaluation by Dr. Merle Teetzen on August 16, 1983, again disclosed an abnormality.

Shawna's mother has testified by deposition that she observed a drastic change in Shawna after December 7, 1982. Counsel for the United States asked if she had noticed a change in Shawna's intelligence level:

A (Mrs. Osborn) I first observed her changing around her second birthday, a drastic change in Shawna.

Q (Counsel for the United States) When you mean a drastic change, what are you referring to?

A Prior to December 7th, she could speak four to six word sentences, was, I would consider almost potty trained, you could reason with her, tell her not to do something and explain it, and she would understand.

After the shot and drug therapy, Shawna was not walking, was crawling again, no longer had the four to six word sentences, nothing she said was legible, her word for airplane changed to buzz-a-bomb, and it was only until a year and a half ago she could said airplane again. We had to start potty training all over again.

Deposition of Pamela Ann Osborn, Vol. I at 152–53.

On May 8, 1984, Dr. D.W. Bartholomew also warned Shawna's mother that Shawna should not have any more DPT shots. On questioning by Government Counsel, Mrs. Osborn testified:

Q Before you left Willford Hall, did you ever have occasion to ask Dr. Malstrom or Dr. Trudeau what the cause was of Shawna's seizure disorder?

A I asked them what they thought, and they didn't know.

Q By they didn't know, what do you mean? They didn't know the cause of her seizure disorder?

A They say sometimes they don't—with seizure disorders in children, they sometimes don't know what causes them.

Q Did Dr. Malstrom or Dr. Trudeau ever tell you that the fourth DPT vaccination that was administered to Shawna was the cause of her seizure disorder?

A No.

Q Did there come a point in time when any physician told you that?

A That it directly caused the problem?

Q That it caused her seizure disorder.

A No, I was told that it can cause problems.

Q Who told you that?

A Dr. Bartholomew.

Q When?

A In March of 1984.

Q What were the circumstances of that conversation?

A Shawna was in the emergency room having what they call cluster seizures, one grand mal seizure after the other.

Q Specifically, what did Dr. Bartholomew tell you?

A He said she had a fever, and she was having seizures, and she was getting older at this point.

I'm asking him about starting school and vaccinations. That's when he tells me that she should not have any more DPT, and I asked him why. He said pertussis can cause bacterial encephalitis. He told me it was whooping cough. He told me pertussis was the drug they used for whooping cough, and then I said what about the things that have happened, the shots in the past. He said he didn't know.

Q I'm not sure I understand what Dr. Bartholomew was telling you when he says pertussis can cause—

A Encephalitis.

Q Encephalitis.

He's referring to the vaccination, the diptheria for tetanus, pertussis vaccination?

A He's telling me that children with a low threshhold for seizures, which Shawna exhibited at the time prior to her fourth vaccination, should not be given pertussis because they have a low threshhold, and it made them more susceptible to problems from pertussis such as encephalitis.

\* \* \* \* \* \*

Q Did he specifically tell you that it was improper for the Air Force to have administered DPT vaccine to Shawna, the fourth DPT vaccination, given her history of prior febrile seizures?

A Yes.

Deposition of Pamela Ann Osborn, Vol. I, 139–141, 142.

## DISCUSSION

The complaint alleges that Shawna developed a generalized seizure disorder as the result of a December 7, 1982, DPT shot. Plaintiffs assert that "Pamela Osborn had no knowledge of either the fact of Shawna's injury or the cause of Shawna's injury on December 7, 1982," and that the claim did not accrue until March 8, 1984. The United States asserts that the claim accrued December 7, 1982.

■ The "accrual" of a claim under section 2401(b) is a matter of federal law. *E.g., Radman v. United States,* 752 F.2d 343, 344 (8th Cir.1985). In *United States v. Kubrick,* 444 U.S. 111, 120, 100 S.Ct. 352, 358, 62 L.Ed.2d 259 (1979), the Court stated that a claim accrues under section 2401(b) when "the plaintiff has discovered both his injury and its cause." The Court of Appeals for the Eighth Circuit has held that in medical malpractice cases, "the claim 'accrues' when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice upon which the cause of action is based." *Reilly v. United States,* 513 F.2d 147, 148 (8th Cir.1975). "Reasonable diligence" is viewed objectively, and varies with the facts of each case. *Arvayo v. United States,* 766 F.2d 1416, 1422 (10th Cir.1985); *Radman v. United States,* 752 F.2d 343, 344 (8th Cir.1985).

Assuming jurisdiction exists, the cause of the injury is the substantive question that must initially be resolved by the fact-finder. At this stage of the proceedings, the cause is unknown and the question before the court is, at what point in the exercise of reasonable diligence should the Osborns have discovered the probable cause of the alleged injury.

■ Accrual of a claim is not delayed until a plaintiff is aware that an injury was negligently inflicted. *Kubrick,* 444 U.S. at 123, 100 S.Ct. at 360. In medical malpractice cases the plaintiff is obligated to seek advice and determine, within the two year period, whether he or she has a case. *Id.* at 123–24, 100 S.Ct. at 360. Moreover, if a plaintiff is incompetently or mistakenly told he or she does not have a case, that error does not delay accrual of the claim until the plaintiff is informed otherwise. *Id.* at 124, 100 S.Ct. at 360.

The record in the case has conclusively established that Shawna experienced her first seizure on August 7, 1982, which was approximately ten months after she had received the last of her first three DPT shots. Following the August 7 seizure, she had another on September 14, and a third on September 15. The EEG administered on October 12, 1982, was normal. Two additional seizures were experienced on November 1, 1982. To this point all of the seizures had been accompanied by a fever. Within an hour after Shawna had received her fourth DPT shot on December 7, 1982, she experienced her first non-febrile seizure. Very soon after, this was followed by a grand mal seizure and later the same day, by a petit mal seizure, neither of which was accompanied by a fever.

The court records and the medical records clearly indicate that none of the many physicians who treated Shawna ever expressed an opinion that the seizures resulted from the DPT shots. An indication that Dr. Bartholomew may have expressed such an opinion arises from the responses of Shawna's mother to the questions asked of her by the government's attorney at the taking of her deposition. Mrs. Osborn's

testimony was somewhat ambivalent. To paraphrase her responses to the question as to whether any physician had told her the DPT vaccination caused the problem, the court notes her answer was "no," but that Dr. Bartholomew told her it could cause problems for someone with a low threshhold for seizures, such as making them more susceptible to encephalitis. Government's counsel was apparently not satisfied with the answer because she then asked as to whether Dr. Bartholomew specifically told her it was improper for the Air Force to have administered the fourth DPT vaccination given when a history of prior febrile seizures existed. Mrs. Osborn's "yes" to that question is the only indication in the court's records or the deposition record that anyone had ever suggested the DPT shots caused the seizures.

6. Dr. Bartholomew's deposition taken by the plaintiff on November 17, 1987, discloses his recollection of the conversation he had with Shawna's mother on March 9, 1984:

Q. [counsel for plaintiff] Okay. Now getting back to the discussions concerning DPT, what did Mrs. Osborn tell you about the shot record as far as what Dr. Oksol had written, do you recall?

A. [Dr. Bartholomew] She just pointed out to me that he had made a notation on the record that she was not to get DPT or part of DPT and since I had asked her about immunization during this seizure she asked if there was a relationship and what that relationship was.

Q. What did you tell her?

A. At that point we had a discussion about the disease of whooping cough and the use of the vaccine and some of the precautions about it.

Q. What did you tell her about those precautions?

A. Several things.

Q. What were those things?

*   *   *   *   *   *

A. Let's see. I would have told her that for many children the vaccine may cause a febrile reaction within twenty-four hours of having it, that in a child that has a seizure disorder a fever as Mrs. Osborn well knew may precipitate a seizure. Okay. We, also, talked about the fact that it had been shown or at least reported that the DPT vaccine had been associated rarely with an encephalitic process, which presumably could exacerbate an underlying neurologic condition. Now it was during the course of this discussion that she started—I believe it was she that mentioned first the relationship of one of her DPT shots to a day she had a lot of seizures.

This conversation which Mrs. Osborn had with Dr. Bartholomew occurred on March 8, 1984.[6]

From an examination of the records, the court finds by a preponderance of the evidence the plaintiff's claim accrued on or before May 6, 1983, being the date the Osborns were advised by Dr. Oskol that Shawna should not be given any more DPT shots. In reaching this conclusion, the court relies on the following evidence.

1.  The seizures did not commence until approximately nine months after Shawna had received the last of her first three DPT shots. The initial seizures were febrile.

2.  The non-febrile grand mal and petit mal seizures incurred shortly after Shawna received the December 7,

*   *   *   *   *   *

Q. After Mrs. Osborn advised you of the history or the seizures following the fourth DPT shot, do you have any opinion as to the significance of the temporal relationship between those seizures and the immunization and the fourth DPT shot?

A. Yes, I had an opinion.

Q. What was your opinion?

A. For the seizures that occurred on that day there certainly seemed to be a temporal relationship to that injection of DPT.

Q. Did you express your opinion to Mrs. Osborn during that conversation.

A. I almost certainly did.

*   *   *   *   *   *

Q. ... What did you say to her about your opinion of the temporal relationship of the seizures following the fourth DPT shot.

A. I believe I said words to the effect that the seizures that she had on that day following her fourth DPT shot may have been precipitated by the injection itself, by the immunization itself.

Q. Did you tell her at that time your opinion as to whether or not future DPT shots were unadvisable or advisable?

A. In my opinion they were not advisable.

Q. Did you tell her at that time whether the fourth DPT shot was advisable or unadvisable at the time it was given?

A. That particular question did not arrise [sic]. I did tell her that I would not have recommended that shot based on what she had told me and, of course, I wasn't there at the time.

Deposition of Dennis Bartholomew, J.D. at 26–27, 30–31.

1982, fourth DPT shot, were more serious and when compared to the earlier seizures were unique.

3. Within two months after the fourth shot, the mother observed a drastic change in Shawna's condition.

4. None of the many physicians who examined Shawna, including government and private physicians, stated an opinion that the seizures were caused by the DPT shots.

5. Assuming that Dr. Barthlolomew advised Shawna's mother on March 8, 1984, that Shawna should receive no more DPT shots, this did not provide any additional information to the Osborns to that possessed by them on May 6, 1983.

Under the facts of this case, if the court assumes that the DPT shots administered by the government physicians were the probable cause of Shawna's seizures, accrual of the claim was triggered by the history of the case prior to May 6, 1983, and the suggestion by Dr. Oksol on May 6, 1983, that DPT shots should be discontinued. Reasonable diligence required the Osborns to determine within two years from that date as to whether to file a claim. If the court were to assume the medical profession was delinquent in its failure to specifically identify the cause of the seizures, the consequences of that failure falls on the plaintiff, not on the United States. *Kubrick*, 444 U.S. at 124, 100 S.Ct. at 360. Plaintiff's claim accrued not later than May 6, 1983, and is barred by 28 U.S.C. § 2401(b). The court lacks subject matter jurisdiction.

IT IS ORDERED plaintiff's complaint and cause of action against the United States is dismissed.