Joseph OSBORN and Pamela Osborn, individually and as father and mother and guardians ad litem of Shawna Osborn, Appellants,

v.

UNITED STATES of America, Appellees.

No. 89–5349.

United States Court of Appeals, Eighth Circuit.

Submitted May 14, 1990.

Decided Nov. 5, 1990.

Lembhard G. Howell, Seattle, Wash., for appellants.

Mary McElroy Leach, Dept. of Justice, Washington, D.C., for appellees.

Before JOHN R. GIBSON, FAGG and WOLLMAN, Circuit Judges.

JOHN R. GIBSON, Circuit Judge.

Joseph and Pamela Osborn, individually and as parents and guardians ad litem of their daughter, Shawna Osborn, appeal from the dismissal of their federal tort claim action asserting that a United States Air Force clinic negligently administered a diphtheria, pertussis, and tetanus (DPT) vaccination, causing Shawna to develop seizures and neurological injury. The sole issue in the case is when did the Osborns, and more specifically Pamela Osborn, first have sufficient knowledge of Shawna's injury and its cause so as to trigger the running of the two-year statute of limitations, 28 U.S.C. § 2401(b) (1988). The district court held that Mrs. Osborn had sufficient knowledge no later than her May 6, 1983, conversation with Dr. Bruce Oksol and that the Osborns' claim was therefore time-barred. *Osborn v. United States*, 713 F.Supp. 341, 346 (D.N.D.1989). The Osborns argue that their claims were timely because they did not have sufficient knowledge until a conversation with Dr. Dennis Bartholomew on March 8, 1984. We reverse the judgment of the district court.

Shawna Osborn was born March 18, 1981, (Osborns' App. at 77) and was, for the first seventeen months of her life, an apparently healthy child. (Osborns' App. at 52, 105, 128.) On June 22, August 24, and October 28 of 1981, she received her first, second, and third DPT vaccinations. (Osborns' App. at 95, 102.) A corpsman at the Immunization Clinic of the Grand Forks Air Force Base Hospital administered the shots. The clinic provided no oral or written information about the potential adverse reactions to the DPT shot, nor did Shawna in fact appear to suffer any ill effects from any of her first three DPT vaccinations. (Osborns' App. at 103–04.)

On August 7, 1982, Shawna suffered her first seizure while sitting in her high chair eating dinner. (Osborns' App. at 106–07.) She was rushed to the base's emergency room and was admitted to the hospital, where she stayed for two days. The doctors diagnosed her as having had a febrile seizure (seizure with fever) along with an ear infection. (Osborns' App. at 23.) Doctors told Mrs. Osborn that many children under age two have occasional febrile seizures and that most outgrow them. (Osborns' App. at 108–110).

On September 14 and November 1, 1982, Shawna again had febrile seizures and was admitted to the hospital. (Osborns' App. at 26, 111, 33.) During the September hospitalization, she had a second seizure within twenty-four hours, resulting in a diagnosis of "complex febrile seizures." (Osborns' App. at 28–29.) In November, doctors diagnosed Shawna as having "complex seizure disorder." (Osborns' App. at 34.) They prescribed Phenobarbital to prevent further seizures. (Osborns' App. at 31.) An electroencephalogram taken on October 12 showed normal results. (Govt.'s App., Vol. I at § 11.)

On December 7, 1982, Mrs. Osborn took Shawna to the immunization clinic for her fourth DPT shot. Before the shot was administered, Mrs. Osborn stopped at the

base's pediatric clinic and had a brief conversation with Dr. Andrew Schuman, one of Shawna's pediatricians. (Osborns' App. at 122.) Mrs. Osborn expressed concern that the DPT could give Shawna a fever that could, in turn, trigger another seizure. Dr. Schuman assured Mrs. Osborn that "the shot was perfectly safe" and "not to worry." (Osborns' App. at 123.) Approximately one hour after receiving her fourth DPT vaccination, Shawna experienced her first non-febrile seizure. (Osborns' App. at 123.) Her mother took her to the family practice clinic, where she was examined and sent home. Shortly after returning home, Shawna suffered a grand mal seizure. (Osborns' App. at 124.) Her parents took her to the emergency room where doctors examined her and found nothing wrong. That evening at home, Shawna had another seizure. (Osborns' App. at 124.) Her parents took her to the emergency room, where she had a petit mal seizure. One of Shawna's pediatricians examined her, then sent her home. (Osborns' App. at 124.)

Following a referral from the base's family practice clinic, Dr. Ross Pettit, a pediatric neurologist, examined Shawna on December 16. (Osborns' App. at 51–53.) He diagnosed her as having a seizure disorder, but identified no cause for her problem. (Osborns' App. at 52.) He did note on his report, a copy of which he forwarded to the Osborns, that the December 7 seizures followed DPT and oral polio vaccinations. (Osborns' App. at 51.) Because of her adverse reaction to Phenobarbital, Shawna was switched to another medication, Dilantin. (Osborns' App. at 56–57.) Mrs. Osborn testified in a deposition that Dr. Pettit assured her, as had one of Shawna's pediatricians, that after a minimum of one year on Dilantin, Shawna would probably be free of seizures. (Dep. of Pamela Ann Osborn, Osborns' App. at 128.) According to Dr. Pettit, if she remained seizure-free for two years after being weaned from Dilantin, then she probably would have no further problem. *Id.*

On January 12, 1983, Shawna had another EEG, this time with abnormal results. (Osborns' App. at 54; Govt.'s App., Vol. I at § 15.) Over the next several months, she continued to have seizures and was hospitalized on several occasions. (Osborns' App. at 39, 43, 44, 62, 65.) On May 6, 1983, Mrs. Osborn had a conversation with Dr. Bruce Oksol, a physician at the pediatric clinic, regarding immunizations to prepare Shawna for preschool. At that time, Dr. Oksol wrote on Shawna's immunization record: "Seizure disorder. Not to get any more DPT vaccine (no pertussis)." (Osborns' App. at 21.) Dr. Oksol also told Mrs. Osborn that Shawna should not get any more of the pertussis vaccine. (Osborns' App. at 133.) Mrs. Osborn concluded that pertussis was the "disease that gives you the fever so that [stopping pertussis] was fine with me." (Osborns' App. at 133.)

On September 14, 1983, Dr. Pettit again evaluated Shawna. (Osborns' App. at 58–59.) His record stated that he did not know the etiology of Shawna's seizures. (Osborns' App. at 59.) Shawna's disorder continued to grow worse, and, in November 1983, she was sent to Wilford Hall, U.S. Air Force Medical Center at Lackland Air Force Base, Texas, where she was evaluated by pediatric neurologists for two weeks. (Osborns' App. at 47–50.) Drs. John Malstrom and Richard Tredeau at Wilford Hall told Mrs. Osborn they did not know the cause of Shawna's seizures; Dr. Malstrom told Mrs. Osborn that Shawna would probably outgrow the seizures. (Osborns' App. at 137–38.)

On March 8, 1984, Shawna suffered multiple seizures and Mrs. Osborn took her to the emergency room. (Osborns' App. at 138.) At the emergency room, Mrs. Osborn spoke with Dr. Dennis Bartholomew. After taking an extensive medical history, Dr. Bartholomew told Mrs. Osborn that the DPT vaccination can cause seizures and that the seizures Shawna had on December 7, 1982, may have been precipitated by the DPT shot she had received earlier that day.[1] Dr. Bartholomew further stated that

1. Dr. Bartholomew saw Shawna on March 8, 1984 at the emergency room and also on March

children with "a low threshold" for seizures, such as Shawna, should not be given the pertussis vaccine and that it was improper for the clinic to have administered the fourth DPT shot to Shawna.[2]

The Osborns filed a claim with the United States Air Force on October 15, 1985, alleging negligence in the December 7, 1982, administration of the DPT vaccination to Shawna. The Air Force investigated the claim and denied it on June 19, 1986. On September 11, 1986, the Osborns filed this action, claiming that Shawna suffered from a generalized seizure disorder as a result of the December 1982 vaccination. The Osborns sued the United States,

---

9 at the pediatric clinic. He stated in his deposition that his recollection of his conversations with Mrs. Osborn was drawn from both of those visits. (Osborns' App. at 177–78.) Dr. Bartholomew testified as follows:

> Q. ... [W]hat did Mrs. Osborn tell you about the shot record as far as what Dr. Oksol had written, do you recall?
>
> A. She just pointed out to me that he had made a notation on the record that she was not to get DPT or part of DPT and since I had asked her about immunizations during this seizure she asked if there was a relationship and what that relationship was.
>
> Q. What did you tell her?
>
> . . . .
>
> A. Let's see. I would have told her that for many children the vaccine may cause a febrile reaction within twenty-four hours of having it, that in a child that has a seizure disorder a fever as Mrs. Osborn well knew may precipitate a seizure. Okay. We, also, talked about the fact that it had been shown or at least reported that the DPT vaccine had been associated rarely with an encephalitic process, which presummably [sic] could exacerbate an underlying neurologic condition. Now it was during the course of this discussion that she started—I believe it was she that mentioned first the relationship of one of her DPT shots to a day she had a lot of seizures.
>
> . . . .
>
> Q. What did she tell you about that that [sic] day?
>
> A. I don't believe she told me anything more than that, that there was a temporal relationship between one of her DPT injections and a—some of her seizures.
>
> . . . .
>
> Q. ... What did you say to her about your opinion of the temporal relationship of the seizures following the fourth DPT shot?
>
> A. I believe I said words to the effect that the seizures that she had on that day following her fourth DPT shot may have been precipitated by the injection itself, by the immunization itself.
>
> Q. Did you tell her at that time your opinion as to whether or not future DPT shots were unadvisable or advisable?
>
> A. In my opinion they were not advisable.

Dep. of Dr. Dennis Bartholomew, Osborns' App. at 178–83.

2. Mrs. Osborn, under questioning by the government's counsel, testified in a deposition regarding her meeting with Dr. Bartholomew:

> Q. Did Mr. Malstrom or Dr. Trudeau [sic] ever tell you that the fourth DPT vaccination that was administered to Shawna was the cause of her seizure disorder?
>
> A. No.
>
> Q. Did there come a point in time when any physician told you that?
>
> A. That it directly caused the problem?
>
> Q. That it caused her seizure disorder.
>
> A. No, I was told that it can cause problems.
>
> Q. Who told you that?
>
> A. Dr. Bartholomew.
>
> Q. When?
>
> A. In March of 1984.
>
> . . . .
>
> Q. Specifically, what did Dr. Bartholomew tell you?
>
> A. He said she had a fever, and she was having seizures, and she was getting older at this point.
>
> I'm asking him about starting school and vaccinations. That's when he tells me that she should not have any more DPT, and I asked him why. He said pertussis can cause bacterial encephalitis. He told me it was whooping cough. He told me pertussis was the drug they used for whooping cough, and then I said what about the things that have happened, the shots in the past. He said he didn't know.
>
> Q. I'm not sure I understand what Dr. Bartholomew was telling you when he says pertussis can cause—
>
> A. Encephalitis.
>
> . . . .
>
> A. He's telling me that children with a low threshold for seizures, which Shawna exhibited at the time prior to her fourth vaccination, should not be given pertussis because they have a low threshhold, [sic] and it made them more susceptible to problems from pertussis such as encephalitis.
>
> . . . .
>
> Q. Did he specifically tell you that it was improper for the Air Force to have administered DPT vaccine to Shawna, the fourth DPT vaccination, given her history of prior febrile seizures?
>
> A. Yes.
>
> Q. Do you recall being told that by anyone else prior to March of 1984?
>
> A. No.

Dep. of Pamela Ann Osborn, Osborns' App. at 138–40.

Wyeth Laboratories, Inc., and Connaught Laboratories, Inc. The court later dismissed Wyeth Laboratories from the case. Connaught entered into a settlement with the Osborns, which was followed by a dismissal. After substantial discovery, including more than 50 depositions, the United States moved for summary judgment based on the statute of limitations.

Applying the preponderance of evidence standard, the district court concluded that the Osborns' claim accrued on or before May 6, 1983, when Dr. Oksol told Mrs. Osborn that Shawna should not be given any more pertussis vaccine. 713 F.Supp. at 346. The district court outlined a number of facts and conclusions on which it relied, including: that Shawna's initial seizures were febrile; that Shawna's first non-febrile seizures occurred shortly after the fourth DPT shot; that Shawna's mother observed a "drastic change" in Shawna's condition starting two months after the fourth DPT shot; that none of the physicians "stated an opinion that the seizures were caused by the DPT shots"; and that the statement of Dr. Bartholomew in March 1984 that Shawna should receive no more DPT did not provide any additional information beyond what Dr. Oksol had told Mrs. Osborn in May 1983. *Id.* at 345–46. Accordingly, the district court held that the Osborns had not met their burden of establishing that their claim was filed within two years of its accrual, and it was therefore barred by 28 U.S.C. § 2401(b).[3] *Id.* at 346.

### I.

Compliance with the statute of limitations of 28 U.S.C. § 2401(b) is a jurisdictional prerequisite to suit under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 2671–2680 (1988). *Radman v. United States,* 752 F.2d 343, 344 (8th Cir.1985). Arguing that the court lacked subject matter jurisdiction, the government moved for summary judgment under Fed.R.Civ.P. 56 and so captioned its motion. In supporting exhibits and memoranda, the government urged that the statute of limitations barred the Osborns' claim. On appeal the government renewed, with the Osborns' concurrence, its argument that summary judgment standards should be applied to the review of the district court's decision.

The district court rejected the government's characterization of its motion and explicitly treated the motion as one to dismiss for lack of subject matter jurisdiction under Fed.R.Civ.P. 12(b)(1). 713 F.Supp. at 341 n. 2. The court did not restrict itself to deciding whether or not the jurisdictional issue presented a question for the trier of fact. Rather, the court carefully considered the whole record, consisting of numerous depositions and exhibits, then decided by a preponderance of the evidence that the Osborns' claim accrued more than two years before its filing and therefore failed to satisfy the jurisdictional requirement.

Because the district court looked to matters outside the pleadings on a motion that it construed as one for dismissal under Rule 12(b)(1),[4] two questions arise: (1) What standard governs the district court's determination of a motion under Rule 12(b)(1) when matters outside the pleadings are considered; and, (2) What is the proper standard of review on appeal?[5]

---

**3.** 28 U.S.C. § 2401(b) provides:

(b) A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of the claim by the agency to which it was presented.

**4.** The district court has authority to consider matters outside the pleadings when subject matter jurisdiction is challenged under Rule 12(b)(1). *Land v. Dollar,* 330 U.S. 731, 735 & n.

4, 67 S.Ct. 1009, 1011 & n. 4, 91 L.Ed. 1209 (1947); *Satz v. ITT Fin. Corp.,* 619 F.2d 738, 742 (8th Cir.1980).

**5.** The Osborns cite *Snyder v. United States,* 717 F.2d 1193, 1195 (8th Cir.1983), for the proposition that summary judgment standards must be applied to a 12(b)(1) motion when matters outside the pleadings are considered. We are convinced that *Snyder* did not squarely address the issue of what standards properly apply. *See also Heille v. City of St. Paul,* 671 F.2d 1134, 1136 (8th Cir.1982); *Satz,* 619 F.2d 738, 742 (8th Cir.1980). *Cf. Haley v. Childers,* 314 F.2d 610,

■ The district court was correct in recognizing the critical differences between Rule 12(b)(1), which governs challenges to subject matter jurisdiction, and Rule 56, which governs summary judgment. Rule 12 requires that Rule 56 standards be applied to motions to dismiss for failure to state a claim under Rule 12(b)(6) when the court considers matters outside the pleadings. Fed.R.Civ.P. 12(b) & (c); *Mortensen v. First Fed. Sav. & Loan Ass'n*, 549 F.2d 884, 891 (3d Cir.1977) (Motion under Rule 12(b)(6) raising matters outside pleadings is converted to a Rule 56 motion). Rule 12 does not prescribe, however, summary judgment treatment for challenges under 12(b)(1) to subject matter jurisdiction where a factual record is developed. Nonetheless, some courts have held that Rule 56 governs a 12(b)(1) motion when the court looks beyond the complaint. *In re Swine Flu Immunization Prod. Liab. Litig.*, 880 F.2d 1439, 1442–43 (D.C.Cir.1989); *In re Swine Flu Prod. Liab. Litig.*, 764 F.2d 637, 642 (9th Cir.1985). We agree, however, with the majority of circuits that have held to the contrary. *See, e.g., Mortensen*, 549 F.2d at 891 (disputed issues of material fact will not prevent trial court from deciding for itself merits of jurisdictional claims); *Mims v. Kemp*, 516 F.2d 21, 23 (4th Cir.1975) (only motion under Rule 12(b) that can properly be converted to one for summary judgment is a motion filed under 12(b)(6)); *Williamson v. Tucker*, 645 F.2d 404, 413 (5th Cir.) (district court has power to decide disputed factual issues in a motion under Rule 12(b)(1)), *cert. denied*, 454 U.S. 897, 102 S.Ct. 396, 70 L.Ed.2d 212 (1981); *Crawford v. United States*, 796 F.2d 924, 928 (7th Cir.1986) (jurisdictional issue must be resolved before trial); *Wheeler v. Main Hurdman*, 825 F.2d 257, 259 (10th Cir.) (as a general rule, 12(b)(1) motion may not be converted to one for summary judgment), *cert. denied*, 484 U.S. 986, 108 S.Ct. 503, 98 L.Ed.2d 501 (1987).

■ The reason for treating a 12(b)(1) motion differently than a 12(b)(6) motion, which is governed by Rule 56 when matters outside the pleadings are considered, "is rooted in the unique nature of the jurisdictional question." *Williamson*, 645 F.2d at 413. It is "elementary," the Fourth Circuit stated, that a district court has "broader power to decide its own right to hear the case than it has when the merits of the case are reached." *Id.* Jurisdictional issues, whether they involve questions of law or of fact, are for the court to decide. *Id.* Moreover, because jurisdiction is a threshold question, judicial economy demands that the issue be decided at the outset rather than deferring it until trial, as would occur with denial of a summary judgment motion.

In a thoughtful opinion authored by Judge Posner, the Seventh Circuit stated:

> We are not being nitpickers in insisting on the difference between a jurisdictional determination and summary judgment. The purpose of summary judgment is to determine whether a trial can be averted. If the party moving for summary judgment fails to demonstrate that there is no triable issue, the case proceeds to trial.... But no case can properly go to trial if the court is not satisfied that it has jurisdiction. The fact that the summary judgment proceeding may not resolve a jurisdictional issue definitively is no ground for assuming jurisdiction and proceeding to trial. The jurisdictional issue must be resolved first.

*Crawford*, 796 F.2d at 928.

■ In *Mortensen*, the Third Circuit explained the unique nature of a factual[6] challenge to jurisdiction under 12(b)(1):

---

613 & n. 2 (8th Cir.1963). For a helpful discussion of the proper treatment of motions brought under Rule 12(b)(1), *see Western Neb. Resources Council v. Wyoming Fuel Co.*, 641 F.Supp. 128, 139–40 (D.Neb.1986).

**6.** A court deciding a motion under Rule 12(b)(1) must distinguish between a "facial attack" and a "factual attack." *Menchaca v. Chrysler Credit Corp.*, 613 F.2d 507, 511 (5th Cir.), *cert. denied*, 449 U.S. 953, 101 S.Ct. 358, 66 L.Ed.2d 217 (1980); *Mortensen*, 549 F.2d at 891. In the first instance, the court restricts itself to the face of the pleadings, *Menchaca*, 613 F.2d at 511; *Mortensen*, 549 F.2d at 891, and the non-moving party receives the same protections as it would defending against a motion brought under Rule 12(b)(6). *Adams v. Bain*, 697 F.2d 1213, 1219 (4th Cir.1982). The general rule is that a com-

[H]ere the trial court may proceed as it never could under 12(b)(6) or Fed.R. Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to the plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

549 F.2d at 891.

■ If the defendant thinks the court lacks jurisdiction, the proper course is to request an evidentiary hearing on the issue. *Crawford*, 796 F.2d at 928. The motion may be supported with affidavits or other documents. *Id.* If necessary, the district court can hold a hearing at which witnesses may testify. *Id.*

As no statute or rule prescribes a format for evidentiary hearings on jurisdiction, "any rational mode of inquiry will do." *Id.* at 929. Once the evidence is submitted, the district court must decide the jurisdictional issue, not simply rule that there is or is not enough evidence to have a trial on the issue. *Id.* The only exception is in instances when the jurisdictional issue is "so bound up with the merits that a full trial on the merits may be necessary to resolve the issue." *Id.*

In the case before us, the statute of limitations inquiry is clearly severable from the merits of the Osborns' claim. The district court correctly rejected the parties' characterization of the motion as one for summary judgment and instead decided the jurisdictional issue. If we were to review the jurisdictional decision under summary judgment standards, we would be deciding

only whether there was a factual issue for decision, a question not presented by the court's order. The final decision of the district court as to jurisdiction deserves our final decision as to its correctness.

■ We therefore turn to the appropriate standard of review on appeal. In *Williamson*, the court concluded that when the district court's decision to dismiss for lack of subject matter jurisdiction is based on the complaint alone, or on the complaint supplemented by undisputed facts evidenced in the record, the appellate court's review is "limited to determining whether the district court's application of the law is correct and, if the decision is based on undisputed facts, whether those facts are indeed undisputed." 645 F.2d at 413. If the court relied, however, on its own determination of disputed factual issues, the appellate court must then review those findings under the "clearly erroneous" standard. *Id.* See also *Eaton v. Dorchester Development, Inc.*, 692 F.2d 727, 732 (11th Cir.1982) (the clearly erroneous standard governs findings of jurisdictional fact).

The material facts are undisputed in the record before us, so the clearly erroneous rule is therefore inapplicable. There was no conflicting deposition testimony concerning Shawna's clinical course or the content of the critical conversations with Drs. Oksol and Bartholomew. Moreover, the judge was not required to and did not make any credibility evaluations. Because the material facts are undisputed, the issue boils down to whether the evidence is sufficient to support the district court's legal conclusion—namely that Mrs. Osborn possessed or should have possessed the requisite knowledge concerning the cause of her daughter's injury no later than the May 1983 conversation with Dr. Oksol.

Our approach in considering the sufficiency of the evidence is similar to the approach used by the *Crawford* court. In

plaint should not be dismissed "'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" *Scheuer v. Rhodes*, 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974) (quoting *Conley v. Gibson*,

355 U.S. 41, 45–46, 78 S.Ct. 99, 101–102, 2 L.Ed.2d 80 (1957)). In a factual attack, the court considers matters outside the pleadings, *Menchaca*, 613 F.2d at 511, and the non-moving party does not have the benefit of 12(b)(6) safeguards. *Mortensen*, 549 F.2d at 891.

*Crawford,* the Seventh Circuit concluded that evidence of the plaintiff's incapacity was not sufficient to toll the statute of limitations. 796 F.2d at 930.

Although the facts of this case are lengthy, the jurisdictional issue centers on the limited question of whether, as the government argues, Mrs. Osborn possessed or should have possessed the requisite knowledge following the conversation with Dr. Oksol, or whether, as the Osborns argue, she did not have the necessary information until the conversation with Dr. Bartholomew.

## II.

■ When a claim "accrues" under the FTCA is a matter of federal law. *Brazzell v. United States,* 788 F.2d 1352, 1355 (8th Cir.1986); *Radman,* 752 F.2d at 344; *Snyder,* 717 F.2d at 1195. The general rule is that a claim accrues at the time of the plaintiff's injury. *Wehrman v. United States,* 830 F.2d 1480, 1483 (8th Cir.1987). Courts recognize, however, an exception for medical malpractice cases, *id.,* in which the injury and cause are not immediately known. *Wollman v. Gross,* 637 F.2d 544, 547 (8th Cir.1980), *cert. denied,* 454 U.S. 893, 102 S.Ct. 389, 70 L.Ed.2d 207 (1981). Under the "discovery rule," which this court applies to medical malpractice cases under the FTCA, the claim accrues when the plaintiff discovers, or should have discovered the cause of injury. *Brazzell,* 788 F.2d at 1355–56. The party who is "claiming the benefit of [the discovery rule] ... bears the burden of showing that he is entitled to it." *Wollman,* 637 F.2d at 549.

■ The district court correctly set out the rule from *United States v. Kubrick,* 444 U.S. 111, 100 S.Ct. 352, 62 L.Ed.2d 259 (1979), governing the accrual of medical malpractice claims under 28 U.S.C. § 2401(b). Under *Kubrick,* the claim does not accrue until the plaintiff is aware both of the injury and its cause. *Id.* at 120–21, 100 S.Ct. at 358–59. The Court rejected the conclusion of an appeals court which held that a claim does not accrue until the plaintiff "knows or should suspect that the doctor who caused his injury was

legally blameworthy." *Id.* at 121, 100 S.Ct. at 359. For statute of limitations purposes, a plaintiff's ignorance of his legal rights should not be treated the same as the plaintiff's ignorance of the existence and cause of his injury. *Id.* at 122, 100 S.Ct. at 359. The Court explained:

That he has been injured in fact may be unknown or unknowable until the injury manifests itself; and the facts about causation may be in the control of the putative defendant, unavailable to the plaintiff or at least very difficult to obtain. The prospect is not so bleak for a plaintiff in possession of the critical facts that he has been hurt and who has inflicted the injury. He is no longer at the mercy of the latter. There are others who can tell him if he has been wronged, and he need only ask. If he does ask and if the defendant has failed to live up to minimum standards of medical proficiency, the odds are that a competent doctor will so inform the plaintiff.

*Id.*

*Kubrick* focused on the plaintiff's duty, once "armed with the facts about the harm done to him" to seek advice regarding the possibility of legal action. *Id.* at 123, 100 S.Ct. at 360. Whether the advice received is competent or incompetent makes no difference to the accrual of his claim. *Id.* at 124, 100 S.Ct. at 360. *Kubrick* makes clear that the statute of limitations begins to run as soon as the plaintiff is aware of the fact and cause of his injury. *Id.* at 122–25, 100 S.Ct. at 359–61.

Although *Kubrick* did not address the plaintiff's duty to attempt to discover the harm in the first place, this court has held that the proper statute of limitations question is when the plaintiff " 'actually knew, or in the exercise of reasonable diligence should have known, the cause and existence of his injury.' " *Wehrman,* 830 F.2d at 1483 (quoting *Snyder v. United States,* 717 F.2d 1193, 1195 (8th Cir.1983)). *See also Brazzell,* 788 F.2d at 1356 ("we believe that [the plaintiff] ought to be charged with ... knowledge [of the cause of her injuries] as soon as she could have discovered the vaccination was the cause

by asking a doctor"); *Reilly v. United States,* 513 F.2d 147, 148 (8th Cir.1975) ("the claim 'accrues' when the claimant discovers, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice....")

Cases in other circuits agree that the plaintiff must exercise reasonable diligence. In *In re Swine Flu Immunization Products Liability Litigation,* the District of Columbia circuit held that an injured plaintiff cannot claim the benefit of the discovery rule simply by waiting passively for the cause of injury to be revealed. Instead, the "plaintiff has a duty to inquire into the unknown cause of a known injury." 880 F.2d at 1443. Similarly, in *Chamness v. United States,* 835 F.2d 1350 (11th Cir.1988), the court observed: "Medical malpractice suits have been conditioned by the exercise of due diligence by those injured." *Id.* at 1352.

### III.

 We now turn to the question of whether there is sufficient evidence to support the district court's determination that it lacked subject matter jurisdiction. We do so accepting the facts as set forth in the district court's opinion.

The issue is what Mrs. Osborn knew or should have known from December 7, 1982, when the fourth DPT shot was administered, until October 15, 1983, the date two years prior to the filing of the Osborns' claim. The Osborns argue that not only were they ignorant of the cause of the injury, they were initially not aware even of the injury itself. Drs. Pettit and Malstrom, both pediatric neurologists, told Mrs. Osborn that Shawna probably would outgrow the seizure disorder.[7] Dr. Pettit also said that things would be "just fine."[8] The Osborns contend that Mrs. Osborn persistently tried to discover the cause of Shawna's disorder, and, that despite her repeated inquiries, doctors could provide no explanation.

The government counters that Mrs. Osborn possessed the necessary information no later than May 1983, pointing to several facts that it argues gave Mrs. Osborn actual or constructive knowledge of Shawna's injury and its cause: that Shawna's first non-febrile seizures occurred shortly after her fourth DPT shot; that these seizures were supposedly more serious and different from her previous seizures; that Shawna started to regress behaviorally within the next few months; and that Dr. Oksol told Mrs. Osborn that Shawna should receive no more pertussis vaccine. The government argues that Mrs. Osborn should have investigated further by asking Dr. Oksol whether the pertussis vaccine was responsible for Shawna's problems.

The record demonstrates that Mrs. Osborn diligently inquired as to the cause of Shawna's seizures and that her efforts were unavailing. Doctors, including one of Shawna's pediatricians, Dr. Schuman, repeatedly told her they could find no reason for Shawna's problems. Dr. Pettit, the pediatric neurologist, stated in a September 1983 report—more than four months after

---

7. Mrs. Osborn testified in a deposition:

Q. What else happened as a result or during the visit with Dr. Pettit? What else did you learn from him?

A. He told us the same thing that Dr. Schuman had said. He thought that he would like her on Dilantin for a minimum of one year, and most probably she'll be seizure free, and then we'll begin to wean her off of it. And if she goes two years after that seizure free, we'll have no problems.

....

Q. What happened during the Willford Hall hospitalization?

....

A. It was suggested to me about the first week we were there by Dr. Malstrom that maybe an ear infection had done her some harm. Then they got to the point where he didn't suggest that anymore.

He said it's a seizure disorder, probably she'll outgrow it.

Dep. of Pamela Ann Osborn, Osborns' App. at 128, 136–37.

8. Mrs. Osborn further testified:

Q. Did you ask Dr. Pettit any of these questions [regarding developmental delays and possible brain damage]?

A. Yes, I asked him these questions, and I was put off by the answer, don't worry, things are just fine.

Dep. of Pamela Ann Osborn, Osborns' App. at 129.

the government contends Mrs. Osborn was aware of the cause of injury—that he did not "have an etiology" and Shawna was a "diagnostic and therapeutic enigma." (Osborns' App. at 59.) In November 1983, Drs. Malstrom and Tredeau, the pediatric neurologists at Wilford Hall, also could not identify a cause for the seizures despite two weeks of examination and testing. Moreover, their medical records stated: "there is no relation to [sic] seizures to *immunizations,* head trauma, or emotional triggers." (Osborns' App. at 47.) (emphasis added.)

The government's argument that Mrs. Osborn should have been alerted by the temporal proximity of the fourth DPT shot to Shawna's first non-febrile seizure is unconvincing. Shawna had had three previous DPT shots and had suffered no apparent ill effects. She also had already had several seizures, with no apparent connection to anything except fever-producing illness. Shawna's doctors had given Mrs. Osborn no written or oral information regarding possible adverse effects of the vaccine. Moreover, Dr. Schuman had assured her just before the fourth shot was given that it was "perfectly safe." In essence, the government's argument is that Shawna's mother should have known the cause of Shawna's difficulties when the doctors, including specialists in pediatrics and pediatric neurology, had not yet reached a conclusion. The argument simply answers itself.

Dr. Oksol's statement to Mrs. Osborn that Shawna was to receive no more pertussis and his written notation on Shawna's immunization record did not impart sufficient information to the Osborns so that they can be charged with actual or constructive knowledge. Dr. Oksol's statement may have demonstrated understandable caution and conservative medical judgment, but it utterly failed to address the issue of causation, which is the critical question before us. His statement, even when considered in conjunction with the temporal proximity of the fourth DPT shot to the first non-febrile seizure, provides an insufficient basis for concluding that Mrs.

Osborn knew or should have known in May 1983 what caused Shawna's condition.

■ This court and several other circuits have held that a plaintiff is entitled to rely on the advice of his doctors. In *Brazzell,* we held that the plaintiff should be charged with knowledge of her injuries at the point when "she could have discovered the vaccination was the cause by asking a doctor." 788 F.2d at 1356. Similarly, in *Reilly,* we stated that while a plaintiff has a duty to exercise reasonable diligence in bringing suit, the concept of reasonable diligence does not "ignore the appellant's reliance on the statements of her doctors that the tracheal stenosis was a normal occurrence of the treatment she had received or her faith in their efforts to cure it." 513 F.2d at 150. The plaintiff can only be charged with the knowledge that a particular medical procedure caused his injuries "when by 'inquiry among doctors with average training and experience in such matters' the plaintiff could have discovered the cause." *Brazzell,* 788 F.2d at 1357 (quoting *Kubrick* ). *See also Nicolazzo v. United States,* 786 F.2d 454, 456 (1st Cir.1986) (the plaintiff can only be charged with the knowledge that he could have acquired by making inquiry among doctors with average training); *Rosales v. United States,* 824 F.2d 799, 805 (9th Cir.1987) ("[p]atients may reasonably rely on assurances by physicians that complications are normal and do not indicate that an actual injury has occurred.")

The Osborns, too, were entitled to rely on the statements of Shawna's physicians. And, until March 1984, their discussions were devoid of any suggestion that the fourth DPT shot may have played a role in the causation of Shawna's seizure disorder.

The government also argues that changes in Shawna's behavior around the time of her second birthday should have alerted Mrs. Osborn that the DPT shot administered three months earlier may have harmed Shawna. While these changes are relevant to the issue of Shawna's injuries, they do not bear strongly on the issue of cause. Moreover, this court stated in *Brazzell* that a plaintiff's "suspi-

**734**

cions about the cause of her injuries" were not sufficient to charge her with the kind of knowledge necessary to start the running of the statute of limitations. 788 F.2d at 1356. In any event, Mrs. Osborn testified that at that time, she had "no idea" that the DPT shot may have been responsible for Shawna's regression. (Osborns' App. at 132.)

The district court concluded that Mrs. Osborn's March 1984 conversation with Dr. Bartholomew provided no more information than the May 1983 conversation with Dr. Oksol. The evidence is to the contrary. Dr. Bartholomew not only told Mrs. Osborn that future DPT shots were inadvisable, he also told her that Shawna's seizures following the fourth DPT shot "may have been precipitated by the injection itself." [9] This statement unequivocally told Mrs. Osborn far more than the statement of Dr. Oksol. The import of the two conversations is the central issue before us. The district court erred in failing to recognize the significance of Dr. Bartholomew's statement.

We conclude (1) that the evidence was insufficient to establish that the conversation with Dr. Oksol imparted to Mrs. Osborn knowledge of the cause of Shawna's condition and (2) that the district court erred in concluding that Dr. Bartholomew imparted no additional information.

The district court erred in dismissing this case for lack of jurisdiction. The Osborns' action is not time-barred because they sustained their burden of demonstrating that they had no knowledge of the cause of Shawna's condition until the conversation with Dr. Bartholomew in March 1984.