# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 06-3549

_____

Jack Hammonds,      *
       *
       Appellant,      *
       *    Appeal from the United States
       v.        *    District Court for the
       *    District of South Dakota.
Hartford Fire Insurance Company,     *
       *
       Appellee.      *

_____

Submitted: April 4, 2007
Filed: September 7, 2007
_____

Before LOKEN, Chief Judge, BEAM, and BYE, Circuit Judges.

_____

BEAM, Circuit Judge.

Jack Hammonds appeals the district court's[1] grant of summary judgment to Hartford Fire Insurance Company (Hartford). Hammonds claims that Hartford acted in bad faith by delaying payments due to him under a settlement agreement and filing a petition to terminate current benefits. Because Hammonds cannot establish loss arising from the only basis for bad faith that he might be able to prove, we affirm.

_____

[1]The Honorable Richard H. Battey, United States District Judge for the District of South Dakota.

## I.    BACKGROUND

In October 1990, Hammonds fell from a roof while working for his employer, Megman Corporation. Having suffered serious injuries, Hammonds filed a worker's compensation claim on a policy issued by Hartford. Hammonds and Hartford entered into a settlement agreement in July 1993 (the 1993 Agreement) which was approved by the South Dakota Department of Labor later that month, as required by state statute. S.D. Codified Laws § 62-7-5.[2]

The 1993 Agreement contained two provisions relevant to this litigation. The first provision, Section 2.B, titled "Attendant Care" and subtitled "Future Care" stated that:

> From and after the date of the execution of this Agreement and continuing for so long as Angela Hammonds continues to provide full-time attendant care to Jack Hammonds, Angela agrees to accept and Hartford agrees to pay Angela for twenty four (24) hours of care per day, at the rate of $6.00 per hour ($144.00 per day), and for seven (7) days per week.

This totaled $4,180.92 per month. Section 2.D, again titled "Attendant Care" and subtitled "Continuing Jurisdiction" stated:

> The parties acknowledge and agree that the [South Dakota] Department of Labor shall have continuing jurisdiction in the future with regard to attendant care and may, upon a change of circumstances and proper application, consider requests by either party to change the foregoing.

---

[2]Such compromise agreements, once accepted by the Department of Labor, have the same force and effect as if the award was actually adjudicated. Sopko v. C&R Transfer Co., Inc., 575 N.W.2d 225, 229 (S.D. 1998).

The Agreement also included various payment and release clauses that have no bearing on the relevant legal inquiry in this case.

After a few years, the Hammonds began experiencing difficulty in their marriage. In August 1996, Angela and Jack separated and Angela moved out of the house.[3] Jack found other individuals–normally employees from his roofing business–to provide the care that Angela was no longer providing.

Shortly thereafter, Hammonds notified Hartford that his wife was no longer providing his attendant care as the 1993 Agreement anticipated and that he would prefer the checks be sent directly to him, so that he could select his own care givers. As he affirmed under oath in his Statement of Material Facts, Hammonds was amenable at this time to "whatever the insurance company want[ed] him to do" for attendant care going forward. Hartford App. 131. Hartford reviewed the request and, in February 1997, agreed to write the checks directly to Hammonds. Hartford contends that this decision was conditioned upon Hammonds' willingness to provide documentation of his attendant care. While nothing in the record definitively confirms the existence of this condition, there appears to be no dispute that Hammonds was advised that selecting his own attendant care givers would require a large amount of record keeping and other documentation.

At some point in 1997–perhaps as early as February–Hartford began requesting documentation from Hammonds to prove he was using the checks for attendant care. Despite Hammonds' earlier assurances that he would do "whatever the insurance company want[ed] him to do," in a subsequent July 1999 phone conversation, he told

---

[3] Hammonds cites various dates of separation ranging from 1995 in his divorce decree to 1997 in his briefs. Because the August 1996 date comes from Hammonds' deposition taken under oath, we rely on it, though the date is not dispositive of any issue.

Hartford he would not provide the documentation because he preferred to pay his attendants in cash. Hartford never received any documentation.

In October 1998, Hartford began a program called the "large case initiative" or the "large loss initiative" which administered claims over $1 million. This was an attempt to produce "an overall savings on loss costs." Hammonds argues that this program (which he calls the "million dollar list") was the impetus for Hartford's alleged bad faith handling of his claim.

Having received no documentation concerning Hammonds' attendant care needs, Hartford initiated an investigation in early 1999. This included requesting Nurse Frances Nichols to outline Hammonds' attendant care requirements. In doing so, she contacted Hammonds' attending physician and learned that attendant care was "not needed." Nurse Nichols, however, felt that six hours of attendant care per day was appropriate, rather than the twenty-four hour care currently provided under the 1993 Agreement.[4] Hartford also hired a private investigator to perform surveillance on Hammonds to determine how much care Hammonds actually used.

Having received no documentation for two years, and having been told in the July 1999 telephone conversation that Hammonds did not intend to provide documentation, Hartford withheld Hammonds' September 1999 attendant care check until November 1999. Hartford also withheld Hammonds' October 1999 check until February 2000. The district court found that Hammonds had admitted these delays were caused by his refusal to provide documentation. Hammonds v. Hartford Fire Ins. Co., No. 04-5055, Order at 9 (D. S.D. Sept. 14, 2006).

---

[4]Hammonds addresses the need for and amount of attendant care as it supports his argument that Hartford had no reasonable basis to "terminate" his benefits altogether. However, as we discuss in Section II.B, under the circumstances of this case, this argument presents a question of law and not a genuinely disputed material fact preventing the entry of summary judgment.

On October 27, 2000, Hartford petitioned the South Dakota Department of Labor for review, citing both the provision that gave the Department of Labor jurisdiction in cases of changed circumstances and the provision that Angela Hammonds was to be paid for the attendant care. The petition alleged that neither Angela Hammonds nor anyone else provided full-time attendant care and that full-time attendant care was not medically necessary. Hartford requested an order "terminating [Hartford's] obligation to pay the attendant care benefit currently paid to [Hammonds]."

Hartford later filed an amended petition that was similar to the original petition but instead sought a determination of the amount of attendant care required by Hammonds rather than an outright termination of Hartford's obligation to pay the current benefits specified in the 1993 Agreement. Hammonds moved for summary judgment, arguing that there was no genuine dispute of material fact over whether there had been a change of circumstances. The administrative law judge denied Hammonds' motion for summary judgment, finding, among other things, that the cessation of Angela's services amounted to a significant change of circumstances. In January 2003, Hammonds and Hartford entered into a new settlement agreement (the 2003 Agreement) which included a new attendant care plan that provided Hammonds $3500 per month. This new agreement was also formally approved by the South Dakota Department of Labor.

Eighteen months later, Hammonds instituted this federal diversity action against Hartford, alleging seven causes of action. The district court determined that all seven claims addressed only one central issue–Hartford's bad faith.[5] The district court granted Hartford's motion for summary judgment, finding that Hammonds failed to

---

[5]The interpretation of a pleading is, of course, a question of law for the trial judge. Lilly v. Grand Trunk W. R.R. Co., 317 U.S. 481, 489-90 (1943).

establish any denial of required benefits whatsoever or, in the alternative, failed to identify any action taken by Hartford without reasonable cause. This appeal followed.

## II. DISCUSSION

We review de novo the district court's grant of summary judgment. Arp v. AON/Combined Ins. Co., 300 F.3d 913, 916 (8th Cir. 2002). We will affirm if the facts viewed in the light most favorable to the nonmoving party–in this case, Hammonds–demonstrate that there is no genuine issue of material fact, and that the moving party–Hartford–is entitled to judgment as a matter of law. See Celotex Corp. v. Catrett, 477 U.S. 317 (1986); Arp, 300 F.3d at 916. Hammonds may not rely solely on his pleadings, but is "required to create an issue of material fact" concerning Hartford's alleged bad faith. Arp, 300 F.3d at 917.

Both this circuit, Ulrich v. St. Paul Fire & Marine Insurance Co., 912 F.2d 961, 963 (8th Cir. 1990), and the South Dakota Supreme Court, In re Champion v. United States Fidelity and Guaranty Co., 399 N.W.2d 320, 322-24 (S.D. 1987), have recognized a cause of action in tort for bad faith failure to pay an insurance claim.[6] South Dakota first recognized the cause of action in Champion, holding that "'for proof of bad faith, there must be an absence of a reasonable basis for denial of policy benefits *and* the knowledge or reckless disregard of [the lack of] a reasonable basis for denial.'" Id. at 324 (quoting Travelers Ins. Co. v. Savio, 706 P.2d 1258, 1275 (Colo. 1985)).

Integral to the inquiry of whether there was (1) an absence of a reasonable basis for denial and (2) knowledge or a reckless disregard of the lack of a basis for denial,

---

[6]We apply South Dakota substantive law because this diversity action was brought in the District of South Dakota, and the district court sitting in diversity applies the substantive law of the state in which it is located. Erie R.R. Co. v. Tompkins, 304 U.S. 64 (1938).

is "whether a claim was properly investigated and whether the results of the investigation were subjected to a reasonable evaluation and review." Case v. Toshiba America Info. Sys., Inc. 7 F.3d 771, 773 (8th Cir. 1993) (quotation omitted). Likewise, "the insurer is still authorized to challenge claims that are fairly debatable." Id.

In his complaint, Hammonds based his bad faith claim on the fact "[t]hat Defendant denied benefits to Plaintiff despite the absence of a reasonable basis for such denial." The 1993 Agreement–a state-approved contract between Hartford and Hammonds–specified the amount of attendant care benefits that Hammonds would receive. This Agreement was modified both orally and by practice between 1996 and 1997, after Angela Hammonds quit providing care and Hartford agreed to pay Jack Hammonds, despite the fact that Angela was no longer providing services as the 1993 Agreement contemplated. Hammonds is not heard to criticize this direct payment arrangement.

The district court granted summary judgment to Hartford because "[v]iewing the facts in a light most favorable to plaintiff, it cannot be said that Hartford denied or withheld benefits." This finding cannot be seriously debated, given that Hammonds twice admitted in his deposition that "[f]rom the day that the settlement was reached in 1993, [he had received] all of the attendant care payments that were set out in that agreement." Hartford App. 33-34. The district court is undoubtedly correct that no benefits were ultimately denied.

While it is clear that there was no eventual denial of benefits in the sense that he was deprived of payments, both this court and the South Dakota Supreme Court have noted that a "'[d]enial of benefits may be inferred from the insurer's failure to process or pay a claim.'" McDowell v. Citicorp U.S.A., 734 N.W.2d 14, 19 (S.D. 2007) (alteration in original) (quoting Kirchoff v. Am. Cas. Co., 997 F.2d 401, 405 (8th Cir. 1993)). A "failure to process or pay a claim" includes delays in payment, so

-7-

that "if defendants unreasonably delayed payment of [benefits due under the 1993 Agreement] with an absence of a reasonable basis for the delay . . . then such conduct might support a claim for bad faith." Id.[7]

At the summary judgment hearing in the district court, Hammonds' attorney agreed that Hammonds' "bad faith claim essentially goes to the issue of the methodology used in the settlement claim" and that the "bad faith claim goes to how the claim was handled." Hartford App. 171. After seeking clarification at oral argument on appeal, we understand Hammonds to allege that two specific actions present a genuine issue of material fact on a claim of bad faith: (1) Hartford's continuous requests for documentation beginning in 1997 and the resulting delays in payment and (2) Hartford's petition to terminate current benefits in 2000.[8] We address each claim in turn in order to determine if a genuine issue of material fact exists, that is, whether there was a reasonable basis for the denial and, if not, whether Hartford knew of or recklessly disregarded the lack of a reasonable basis for its conduct.

---

[7]Despite Hammonds' best attempts to redefine what "bad faith" means in South Dakota, the South Dakota Supreme Court, exercising its undeniable province to say what the law in South Dakota is, has already defined the tort of bad faith denial of insurance claims. Champion could not be more clear: you need a denial, explicit–or as Kirchoff held–implied; a lack of a reasonable basis for the denial; and knowledge of (or reckless disregard of) the lack of a reasonable basis. Champion, 399 N.W.2d at 324. That inquiry and that inquiry alone informs the case before this court.

[8]The only other purported bad faith denial of benefits due under the 1993 Agreement involves the denial of payment for a Viagra prescription. When repeatedly pressed at oral argument to identify the actions constituting bad faith, Hammonds' counsel did not mention Viagra. Regardless, the question of whether Viagra was covered under the 1993 Agreement as "future care" involves the interpretation of the contract and is thus a question of law, not a genuinely disputed question of material fact.

## A.    The Request for Documentation

Hammonds asserts that Hartford's requests for documentation and the resulting delays in payment were done in bad faith in order to leverage a superior bargaining position in the relationship.  Hammonds suggests that the requests for documentation, along with all other alleged bad faith actions, were part of an extensive, nefarious scheme revolving around the 1998 "large loss initiative."[9]

Hammonds argues that by requesting documentation and delaying payments when documentation was not received,  Hartford acted in bad faith because "Hartford admitted it had no right to require documentation." Hartford App. 131.  However, the <u>Champion</u> tort inquiry does not concern itself with a dispute over what "rights" Hartford had under the parties' contractual agreements.  This question, which is a matter of contract interpretation–determining the rights and obligations arising from the contract–presents a question of law, rather than a question of fact.  <u>Simeone v. First Bank Nat'l Ass'n</u>, 971 F.2d 103, 106 (8th Cir. 1992).

---

[9]Hammonds has papered the record with documents illustrating bad faith type acts throughout the entire relationship of the parties, arguing that this general ambience of unfairness on the part of Hartford violated an implied duty of good faith and fair dealing.  There is no doubt that every contract, including the 1993 Agreement, carries with it an implied duty of good faith.  <u>Garrett v. BankWest, Inc.</u>, 459 N.W.2d 833, 841 (S.D. 1990).  There is also no doubt that the implied duty "is not a repository of limitless duties and obligations" akin to "an amorphous companion contract with latent provisions to stand at odds with or in modification of the express language of the parties' agreement." <u>Nygaard v. Sioux Valley Hosp. & Health Sys.</u>, 731 N.W.2d 184, 194 (S.D. 2007) (quotations omitted).  Where the express language of the contract addresses the matter at issue, there is no need to turn to the implied covenant. <u>Id.</u>  Here, the payment or denial of benefits was expressly provided for in the 1993 Agreement, and any purported breach of contract is actionable through contract interpretation by a tribunal with jurisdiction or through the bad faith tort recognized in <u>Champion</u>, making any reference to a free- standing implied duty of good faith irrelevant.

On this question of law, we will assume that the parties agreed to what Hammonds said they agreed to, namely, that Hartford would continue to pay the amount agreed upon in the 1993 Agreement directly to Hammonds and that there was no requirement that Hammonds provide documentation that he was using the money for attendant care.[10] Thus, the focus of our investigation is whether Hartford acted in bad faith by delaying the transmittal of two payments in retaliation for Hammonds failure to provide documentation, despite the fact that he was not required to provide documentation.

Even assuming that Hammonds could successfully prove this tort to a jury's satisfaction, his claim still suffers a fatal defect. As with any other tort, in addition to proving that Hartford acted in bad faith, Hammonds also must prove that he "suffered a compensable loss as a result" of the behavior. <u>McDowell</u>, 734 N.W.2d at 19. McDowell, like Hammonds, entered into a settlement agreement with an insurance company, which agreement required that the company pay for necessary medical bills. She sued the insurer for failure to pay three bills in a timely fashion. <u>Id.</u> The South Dakota Supreme Court noted that McDowell could not prove loss from the delays, as "she ma[de] no claim that during the time these three bills were unpaid her medical providers refused to continue treating her." <u>Id.</u> at 21.

Like McDowell, Hammonds has failed to allege or show that he suffered any compensable loss of services or attendant care as a result of the delays in payment. Indeed, he admitted, in a sworn deposition, that at the time of the filing of this action, all monies owed to him under the 1993 Agreement and the later agreement to pay him directly had been paid. Hartford App. 33-34. The record only reflects that a certain number of days passed between the time Hammonds was to receive payment and the time he actually did receive the payment. There is no proof that Hammonds suffered

---

[10]Hammonds admitted in his deposition that he was not using the full amount of the monthly payments for attendant care. Hartford App. 102.

any "loss" as a result of the delay. Thus, the grant of summary judgment on this issue was proper. <u>McDowell</u>, 734 N.W.2d at 21.

## B. Hartford's 2000 Petition

As an initial matter, Hammonds has been unclear as to the gravamen of his bad faith allegations based on Hartford's petitions to the South Dakota Department of Labor for either termination or a new determination of Hammonds' attendant care benefits. To some extent, the parties argue over whether Hartford's initial filing was actually a petition to terminate all benefits, forever, or a petition to terminate "current" benefits with revised benefits to follow. This, however, cannot present a material issue of fact because the interpretation of a pleading is a function that rests with a court as a determination of law, rather than with a jury. <u>Lilly v. Grand Trunk W. R.R. Co.</u>, 317 U.S. 481, 489-90 (1943).

Assuming, however, that Hammonds means to allege that the filing of a petition–whatever its meaning–was an act of bad faith, we must again look to <u>Champion</u>. We will also assume that the filing of a petition to terminate is close enough to a "failure to process or pay a claim" to be considered a denial of benefits, though we are doubtful that it can.

We then ask whether there was a reasonable basis for the denial and whether Hartford knew of or recklessly disregarded the lack of a reasonable basis. The October 2000 petition sought "an Order terminating Insurer's obligation to pay the attendant care benefit currently paid" to Hammonds. This was based on the fact that Angela Hammonds no longer provided the care, that no one provided full-time care, and that full-time care was not medically necessary.

Addressing only the strongest of reasonable bases upon which Hartford could have relied, we note first that the 1993 Agreement specifically allowed Hartford to

-11-

take this action when there was a change in circumstances. The 1993 Agreement also specifically conditioned the continuation of payments "for so long as Angela Hammonds continues to provide full-time attendant care to Jack Hammonds." Angela's cessation of attendant care was clearly a change of circumstances that gave Hartford a reasonable basis for filing the petition.

In addition to Angela's departure, Hartford also conducted an investigation of Hammonds' situation to support its belief of a change in circumstances. As mentioned, Nurse Frances Nichols outlined her view of the attendant care needs of Hammonds, which included an admission by Hammonds' doctor that he needed no attendant care at all. An additional investigation confirmed that Hammonds might not have been using full-time attendant care.

In conclusion, Hartford had multiple reasonable bases for moving to terminate the current benefits paid to Hammonds. We need not find that Hartford's conclusion about Hammonds' situation was correct. We need only to find that the issue was fairly debatable. Case, 7 F.3d at 773 (citing Savio, 706 P.2d at 1275). In light of all of the undisputed facts, we conclude that Hartford did not act in bad faith under South Dakota law.

## III.   CONCLUSION

We affirm the judgment of the district court.

BYE, Circuit Judge, dissenting.

I respectfully dissent. Our responsibility in reviewing the grant of summary judgment is to look at the facts in the light most favorable to the non-moving party. We are obligated to consider the non-movant's version of the facts and all of its reasonable inferences. Sadly, the Court fails to undertake this fundamental task.

-12-

Much of the Court's opinion reads like a closing argument Hartford may have given after trial – construing facts in Hartford's favor and wholly ignoring facts which favor Hammonds.  In affirming the district court because "Hammonds cannot establish loss arising from the only basis for bad faith that he might be able to prove," the Court ignores the "loss" Hammonds actually claimed in these  proceedings, and substitutes its own view of the alleged loss.  I therefore feel compelled to set forth Hammonds's side of the case so as to allow the readers of this decision to decide for themselves whether a reasonable jury could find Hartford acted in bad faith in handling Hammonds's claim.

I

The level of severity of Hammonds's injuries is highly relevant to his claim of bad faith, and yet the Court says nothing more than he "suffered serious injuries."  In fact, Jack Hammonds is an incomplete quadriplegic who uses a wheelchair.  Incomplete quadriplegia is paralysis that affects all four of a person's limbs, even though there is some preservation of sensory or motor function below the level of lesion.  In Hammonds's case, his work injury left him unable to use his left limbs, and limited the use of his right limbs.  Appellee's App. 11.

In addition, the Court fails to disclose salient facts contained in a February 1997 report prepared for Hartford by Intracorp regarding the attendant care Hammonds *requires* because of his quadriplegic condition:

> [H]is personal needs . . . ***require 24 hour monitoring and assisting the patient with activities of daily living***, preparing his food, washing and ironing his clothes and bed linen[.]
>
> . . .

Patient needs assistance to get in and out of bed, dress and undress himself, shave, brush teeth with set up, comb his hair and other related personal hygiene. He needs assistance in bathing or showering. He has a tub bench. The patient must have enemas every other day for his bowel program and assistance is needed. He has a special commode seat that makes it easy to give the enema while he is sitting on the commode. He needs assistance in managing his bowel program.

The patient is catheterized 3-4 times a day, more often if he needs to be. He has some feeling in his bladder and can tell if his bladder is full. He tries at times to self catheterize himself with assistance, but his sterile technique is not perfected and he is prone to develop bladder infections. He uses a special condom/disposable catheterization set.

During the week days, his assistant drives him to roofing job sites.[11] He returns home for lunch which is prepared for him, as are all his meals. His meals are served with a special set up so that he can do as much as possible for himself.

The patient requires range of motion exercises to be done once a day. The patient cannot open his medication bottles and needs someone to give him his medicine.

Appellant's App. 12, 14 (emphasis added).

While Hammonds minimized his own need for attendant care, the professional opinions set forth in the Intracorp report must be viewed in Hammonds's favor. This evidence indicates the change of circumstance which occurred when Hammonds's wife, Angela, quit providing attendant care was not about whether Hartford could *terminate* attendant care, but only about how the change of circumstance would affect the *extent* to which Hartford was required to satisfy its continuing obligation to *provide* attendant care. Hartford acknowledged as much, another fact favorable to

---

[11]Despite his physical limitations, Hammonds works as a roofing contractor, supervising others.

-14-

Hammond which the Court ignores. Hartford supervisor Lynn McDonald testified as follows:

    Q.    And a quadriplegic, your understanding of a person who is quadriplegic, what does that mean?

    A.    They sustained a spinal cord injury, cervical, and it has resulted in affecting their extremities, upper and lower.

    Q.    That's one of the catastrophic injuries, right, listed in the manual?

    A.    Yes.

    Q.    I mean, it is a catastrophic injury?

    A.    Yes.

    Q.    Have you ever in your life known a quadriplegic who did not need some attendant care?

    A.    No.

    Q.    Can you even imagine a situation where a quadriplegic would not need some attendant care?

    A.    No.

Id. at 39.

Moreover, the change of circumstance occasioned when Angela quit providing attendant care inured not to Hartford's benefit, but to its detriment. The 1993 Agreement provided Hammonds would be paid future attendant care at the reduced rate of $6 per hour, or $144 per day, for Angela's care. By contrast, professional attendant care would have cost $273.40 per day. Id. at 11. Over the course of

-15-

Hammonds's expected lifetime, the reduced rate paid by the insurance company under the 1993 Agreement would save it $1,888,840, id., or close to $47,000 per year.

Faced with this economically unfavorable change of circumstances, Hartford understandably chose not to petition the South Dakota Department of Labor to modify the 1993 Agreement. Instead, Hartford initially chose to pay Hammonds directly for attendant care under the same terms required by the 1993 Agreement, leaving him responsible for finding his own caregivers. As a consequence, Hartford continued to save a substantial amount of money for its attendant care obligations.

These facts, again not considered by the Court, are critical because they support the premise of Hammonds's bad faith claim. Hammonds claims Hartford deliberately engaged in a course of conduct aimed at turning this detrimental change of circumstance to its favor. Hartford intended to make life difficult for Hammonds and weaken his resolve so he would accept less than full value for his future attendant care when Hartford finally discussed settlement with him. Hammonds further claims Hartford acted with its own economic self interest in mind when it engaged in this course of conduct because Hammonds's file was on the "million-dollar list," a tabulation of files involving catastrophically injured claimants with a potential exposure exceeding $1 million. Hartford planned to pursue "aggressive" settlement tactics in order to reduce its exposure in files on its "million-dollar list." Id. at 54.

The following is a discussion of further evidence the Court fails to discuss or address, which supports Hammonds's theory.

Hartford's Claim Handling Manual directs its adjusters to "move the file to a scenario where, the claimant and his/her counsel, want to settle the claim. You should evaluate all the possible mitigation factors available to *create the necessary leverage* for a positive settlement result." Appellant's App. 57 (emphasis added). This

directive, while not malevolent in and of itself, was used to justify conduct which a reasonable jury could find evinced bad faith in Hammonds's case.

After Hammonds was placed on Hartford's "million-dollar list," Hartford's log for Hammonds's file contains the following entry dated June 9, 1999: "Essentially we are looking at *creating a controversy[12] over the attendant care issue prior to entering into negotiations*." Id. at 29 (emphasis added)

The very next day, Hammonds's file was reassigned to an adjuster with these instructions:

> I am sending to you FYI as this is a SD case headed your way that needs some immediate attention. It is on the "$1 million" dollar settlement list for 1999 WC LOB Goals. . . . Mary Herrmann was to address the attendant care, *leverage off the "controversy created,"* involve Dave Korch, and proceed with settlement negotiations. She initiated some steps in the right direction, but has now left the company. Our experience has shown these large cases take much time and attention to move. *With the attendant care issue, now is the perfect time for HIG to take action*. . . . What we need is a Handler to pick up the case and *aggressively evaluate for settlement* . . . My records show HIG is paying $4,300 monthly ($51,600 year!) on attendant care alone. Dave Korch notes $36k year. This is substantial dollars and now LCP spoke to attendant Dr who say figure should be $0?? *How do we stop the bleeding, so to speak?*

Id. at 59 (emphasis added).

---

[12]Hartford's Claim Manual merely instructs adjusters to create "leverage" for a positive settlement result. While using leverage to settle may not be inappropriate in and of itself, a Hartford representative admitted it would be "inappropriate" to "purposely *create a controversy* just for purposes of obtaining leverage over one of the claimants you were dealing with." Ronald Banning Deposition at 111-12 (Appellant's App. 23) (emphasis added).

An internal Hartford memo dated July 26, 1999, contains this discussion about Hammonds's file:

> The very best time to **settle a case is when there is a controversy/conflict. We are headed in that direction on this file once we have built a defense re: the attendant care.** "Give the clmt a reason to want to settle" is a phrase I often hear. At the present, clmt is very happy collecting his WC. No need to show receipts, identify tax ID of attendant provider, money is paid to clmt directly, etc. Clmt needs to be told **we plan to change this easy ride** and begin aggressively managing this file and expenditures. Our Goal should be to **posture this claim before the clmt in such a way that he becomes aware of the down side he faces (ie: cutting attendant care drastically)** to the point where he finds it **more palatable to settle with The Hartford** . . . **than to leave the case open and be subject to Hartford's scrutiny** of his activities and benefits.

Id. at 61 (emphasis added).

On August 23, 1999, Hartford's "large case negotiator," David Korch, inquired about the status of Hammonds's file: "Where do we stand regarding the **controversy that we could leverage off of**, i.e., the need for attendant care? Please advise." Id. at 80 (emphasis added).

Significantly, just one month later, Hartford withheld payment of Hammonds's September 1999 attendant care payment for over two months. Hartford also withheld payment of Hammonds's October 1999 attendant care payment for an even longer period of time, until February 2000. Hartford did not resume regular attendant care payments until April 2000, disrupting Hammonds's receipt of regular payments for over half a year. The record indicates Hartford knew a delay of months in attendant care payments could be stressful and difficult for a claimant, as Hartford representative Ronald Banning admitted in his deposition:

-18-

Q. And did you find that in your various experiences with The Hartford that when you're dealing with a claimant in a workers' compensation case, oftentimes those payments can be their only stream of income?

A. That's right.

Q. And as a result, a delay of weeks can sometimes be very significant to a claimant?

A. Yes.

Q. And a delay of months to a claimant can sometimes be very stressful or very difficult to address financially?

A. Yes.

Q. And that's why The Hartford told you that payments should be made to a claimant on a timely fashion?

A. Well, not – yes. Not only Hartford, but as the state statute as well.

Id. at 17.

Hammonds contends these payment delays were part of Hartford's plan to "create a controversy" regarding attendant care payments in order to "leverage off" the controversy and "posture" the claim to send a message his "easy ride" was over before Hartford proceeded with settlement negotiations. Certainly, the timing of the payment delays, occurring shortly after Hartford representatives made damaging statements in internal documents, supports this claim and raises a genuine issue of material fact for a jury to resolve.

The Court improperly resolves the payment delay issue against Hammonds by viewing the facts in the light most favorable to Hartford. The Court accepts and adopts Hartford's argument the delay in payments was justified because Hammonds

did not provide documentation of his attendant care.  But the 1993 Agreement did not obligate Hammonds to provide documentation of his attendant care as a condition of receiving payments.  Furthermore, the record indicates Hartford knew it was inappropriate to withhold payments on this basis.  In February 1999, Hartford's attorney, Richard Travis, specifically advised Hartford that withholding payments due to lack of documentation was contrary to the 1993 Agreement and improper:

> Q. Then in '99 on February 4th, the claims file indicates you gave them the opinion that to discontinue benefits based on his not providing documentation would be improper?
>
> A. I told them not to discontinue benefits at that time, that's correct.
>
> . . .
>
> Q. It appears that the adjuster in this case was not issuing attending care because documentation had not been provided. Correct?
>
> . . .
>
> A. That's what the log reflects.
>
> Q. The log reflects that they are not paying him his attending care based on the fact that he isn't providing documentation; correct? That's what the log indicates?
>
> A. That's a fair read of that.
>
> Q. That would have been contrary to the opinion you gave them; is that fair?
>
> A. That would be inconsistent and contrary to that conversation of February 4, 1999.

Id. at 4.

-20-

To make matters worse, in order to justify resolving this disputed fact in Hartford's favor rather than Hammonds's favor, the Court misconstrues the evidence in the record. According to the Court, Hammonds admitted the payment delays "were caused by his refusal to provide documentation." <u>Ante</u> at 4. In fact, this alleged admission is nowhere to be found in the evidence submitted in the record on appeal. To the contrary, when Hartford included a claim in its Statement of Material Facts in Support of its Motion for Summary Judgment that "[d]espite Plaintiff's failure to provide the necessary documentation, Hartford nonetheless continued to comply with the 1993 Agreement," Hammonds's objected and stated in his response : "The records produced in this case document numerous month long delays in paying Hammonds. (Ex. 13: Todd Dep. p. 77:5-9). These delays were part of the creation of a controversy, as well as taking away Plaintiff's 'easy ride.' Such delays, as Hartford admitted, were stressful and brought about financial difficulties to Hammonds. (Ex. 4: Banning Dep. p. 13:3-9)." Appellee's App. 144.

To support its conclusion Hammonds admitted the payment delays were attributable to his refusal to provide documentation, the Court cites the order granting summary judgment, indicating the district court "found" Hammonds admitted to being the cause of the delays. <u>Ante</u> at 4. This "finding" by the district court is not, however, supported by the record. District courts should not make findings on disputed issues of fact in summary judgment proceedings, they should view the evidence in the light most favorable to the non-moving party. When a district court grants summary judgment on purportedly undisputed facts, our job as an appellate court is to determine "whether those facts are indeed undisputed." <u>Osborn v. United States</u>, 918 F.2d 724, 730 (8th Cir. 1990). When a district court relies "on its own determination of disputed factual issues, the appellate court must then review those findings under the 'clearly erroneous' standard," <u>id.</u>, not rely upon and thereby perpetuate the district court's error. The district court clearly erred in "finding" Hammonds admitted to being the cause of the delays because such a finding is not supported by the record.

In addition, the Court concludes it was reasonable for Hartford to request documentation (and thus reasonable to withhold and delay payments) because "[a]s he affirmed under oath in his Statement of Material Facts, Hammonds was amenable . . . to 'whatever the insurance company want[ed] him to do' for attendant care going forward." Ante at 3. The Court ignores, however, the fact that Hammonds's Statement of Material Facts specifically refers to the source of the statement as the "IntraCorp Report attached as Ex. 3." Appellee's App. 131. A review of the IntraCorp Report reveals that Hammonds never represented to Hartford he would do *whatever* the insurance company wanted him to do. Gary Eberhardt – not Hammonds – made the statement in the IntraCorp when discussing Hammonds's desire to hire his own personal caregivers, rather than having Hartford pay an outside agency for attendant care. Specifically, Eberhardt states Hammonds "is willing to let an agency handle the hiring of his personal aides but would prefer to do it himself. He said that it would be okay with him, whatever the insurance company wants to do." Appellant's App. 13.

Thus, the statement the Court relies upon is merely Eberhardt's paraphrase of what Hammonds actually said. More importantly, the context of the paraphrased statement is clearly limited to the choice between: 1) allowing an outside agency to handle the hiring of the attendant caregivers, or 2) allowing Hammonds to hire attendant caregivers directly. Using this paraphrased statement of Eberhardt, the Court creates the impression Hammonds, specifically in the context of requiring documentation for attendant care, directly assured Hartford he would "do whatever the insurance company wants to do." Nothing in the record – not even the fact that Hammonds adopted the statement in his Statement of Material Facts – suggests any connection between the statement and the provision of documentation; the Court simply creates such a connection out of whole cloth.

In fact, the record indicates the parties dispute the extent to which documentation for attendant care was discussed between Hammonds and Hartford. In its Statement of Material Facts in Support of its Motion for Summary Judgment,

-22-

Hartford claims to have advised Hammonds "he would be required to support the benefits with evidence of his expenses" from February 1997 going forward. Appellee's App. 15. In his response, Hammonds objected to that statement and indicated:

> It is undisputed that it was <u>Hartford's</u> decision to pay Hammonds directly to continue being the beneficiary of a large annual savings and make him find his own caregivers. . . . Regarding documentation, Hartford may have started asking for it, but the testimony of its own representatives clearly dictates, as does the advice of its attorney, it had <u>no</u> basis for doing so.

<u>Id.</u> at 142.

Hammonds also disputes the contents of the July 1999 phone conversation between himself and a Hartford representative. According to Hartford's Statement of Material Facts, during the phone call Hammonds "refused to provide any documentation for his attendant care, stating that he preferred to pay his attendants in cash so that the money would not be reported as taxable income to them." <u>Id.</u> at 15. In his response, Hammonds disputed that characterization of the phone call, indicating instead he "admits that he told Hartford that the contract that he signed with Hartford in 1993 did not require him to produce documentation because the amount negotiated in 1993 was a negotiated, and drastically reduced, amount." <u>Id.</u> at 144.

Instead of construing this disputed fact in Hammonds's favor, as the Court is required to do for purposes of summary judgment, the Court's opinion adopts almost verbatim Hartford's version of the dispute. <u>Ante</u> at 3-4 ("[I]n a subsequent July 1999 phone conversation, he told Hartford he would not provide the documentation because he preferred to pay his attendants in cash.").

The Court also ignores Hammonds's claim about Hartford engaging in low-ball settlement tactics when it finally discussed settlement of the attendant care issue with him. We previously acknowledged, in a case involving a bad faith failure to pay a workers' compensation claim under South Dakota law, an insurance company acts in bad faith by extending a settlement offer well below the actual value of a claim, i.e., engages in low-ball settlement tactics. See Arp v. AON/Combined Ins. Co., 300 F.3d 913, 916 n.4, 918-19 (8th Cir. 2002) (reversing the summary judgment dismissal of a bad faith claim after concluding, in part, the insurer's offer to settle a claim for $12,151.16 was "further evidence of bad faith" where the insurer had "concluded that James would require a payment of approximately $1,900,000.00 in disability benefits over the course of his lifetime[,]" i.e., set the reserve on the file for that amount); see also Kirchoff v. Am. Cas. Co., 997 F.2d 401, 405 (8th Cir. 1993) (affirming a jury's finding that an insurer's offer of $8,000 was made in bad faith where the claim was valued at $300,000). Hammonds contends the facts of his case are close enough to those involved in Arp to create a submissible issue for a jury as to whether Hartford engaged in bad faith when it offered him $400,000 for a global settlement of his case, even though Hartford's reserve on his file was $3,000,000.

In Arp, the $12,151.16 offer represented a 99% reduction in the total estimated value of the case, i.e., the insurer's reserve for the file. In Kirchoff, the $8,000 offer represented a 97% reduction in the estimated value of the case. Here, the $400,000 offer represents an 86% reduction in the estimated value of the case when compared to Hartford's reserve on the file. Thus, while the amount of the offer is not as egregious as the amounts involved in Arp and Kirchoff, the question still remains whether Hartford's low offer creates a submissible issue of fact for a jury to determine whether Hartford engaged in bad faith settlement tactics. While this case may fall on the borderline in that regard, it is nevertheless preferable to allow a jury to determine the issue, rather than a judge. While my colleagues on the panel may disagree with me in that regard, what I find most disappointing is the Court's failure to even acknowledge and address this issue in its opinion.

When I consider this record in its entirety,[13] and actually undertake the task of viewing the evidence in the light most favorable to Hammonds, it is clear to me summary judgment was inappropriate. Not only should this case be submitted to a jury for resolution, it appears Hammonds has a very strong case. Our court has clearly usurped the role of the jury in this case.

---

[13]Additional evidence offered by Hammonds in support of his bad faith claim, which I have not even discussed, includes the following:

1) Hartford refused to pay for Hammonds's prescription for Viagra, even though his impotency was related to his quadriplegia and Hartford's internal documents, as well as deposition testimony from its representatives, confirm it knew it had no medical basis for refusing to pay for the prescription (Appellant's App. 22, 26, 82);

2) Hartford sent a private investigator into Hammonds's home under the false pretenses of wanting to buy a vehicle in order to conduct surveillance;

3) Hartford threatened Hammonds with Medicare and Social Security fraud for allegedly taking "overpayments" for the amounts Hartford was obligated to pay Hammonds pursuant to the 1993 Agreement, even though there was evidence Hartford had been warned by an attorney that it "had better not threaten fraud complaint to Soc Sec Ad to enhance its negotiating position." (Id. at 60); and

4) the Hartford attorney who flatly denied in his deposition having ever seen the "million-dollar" list (id. at 78), is specifically identified in Hartford internal documents as the "lead" person on the project – distributing the list to others via email, and giving instructions on the use of the spreadsheet which generated the list (id. at 48-50).

## II

The Court accuses Hammonds of attempting to "redefine" what bad faith means in South Dakota, ante at 8 n.7, and then concludes Hammonds failed to prove bad faith because he did not suffer a compensable loss. To the contrary, Hammonds's claim satisfies the elements of a bad faith claim under South Dakota law, and it is the Court which "redefines" his alleged loss in order to justify affirming the grant of summary judgment.

I have no quarrel with the Court's premise South Dakota requires a plaintiff to show a denial of benefits in a workers compensation bad faith claim. See In re Champion v. United States Fid. & Guar. Co., 399 N.W.2d 320, 324 (S.D. 1987). Citing McDowell v. Citicorp U.S.A., 734 N.W.2d 14, 19 (S.D. 2007), the Court further acknowledges a denial of benefits may be inferred from the failure to process or pay a claim, and also acknowledges South Dakota equates unreasonable delays in the payment of benefits with the failure to process or pay a claim. Ante at 7-8. The Court even acknowledges there were delays in the payment of benefits in this case, but nevertheless concludes Hammonds suffered no compensable loss because he ultimately received the delayed payments. Id. at 10-11.

Setting aside for a moment the fact there is a material dispute about whether Hartford's payment delays were reasonable (and thus the unreasonable delay itself would be the compensable loss Hammonds suffered), the quarrel I have with the Court's opinion is its absolute failure to address the actual loss claimed by Hammonds. Hammonds contends his loss is the difference between the full value of his future attendant care benefits and the reduced value he accepted because Hartford engaged in bad faith settlement tactics. Hammonds relies upon Hartford's payment delays as just one of the many bad faith tactics Hartford engaged in prior to negotiating a settlement with him.

The loss at issue satisfies <u>Champion</u>'s requirement that there be a denial of benefits. The denied benefits are the portion of Hammonds's future attendant care benefits Hartford failed to pay when it allegedly coerced Hammonds into accepting a reduced settlement by engaging in bad faith tactics. South Dakota clearly recognizes a bad faith claim can arise during the settlement process. <u>See</u> <u>Champion</u>, 399 N.W.2d at 323 ("The Compensation Act should not be a 'shield' which will insulate those who would engage in intentional wrongdoing in the settlement and investigation of workers' claims.") (quoting <u>Hayes v. Aetna Fire Underwriters</u>, 609 P.2d 257, 262 (Mont. 1980)); <u>see also</u> <u>Hein v. Acuity</u>, 731 N.W.2d 231, 235 (S.D. 2007) ("A bad faith claim related to workers' compensation . . . exists when an insurer breaches its duty to deal in good faith and fairly when processing a workers' compensation claim.").

In <u>Kirchoff</u>, and again in <u>Arp</u>, the Eighth Circuit specifically recognized a denial of benefits can be inferred from the manner in which an insurer conducts itself during settlement negotiations. In <u>Kirchoff</u>, the insurer, CNA, claimed it had not denied benefits because it made a settlement offer, albeit a low one. 997 F.2d at 405. We rejected CNA's argument, stating "[b]ut Kirchoff testified that she believed CNA's offer to pay only its estimated defense costs was effectively a denial of her claim. While that might not be the conclusion one would expect of an experienced insurance claims representative such as Kirchoff, it could be the conclusion of a reasonable person." <u>Id.</u> The Court further concluded "the jury easily could have found CNA had no reasonable basis for refusing to settle with Kirchoff . . . CNA had a duty to negotiate settlement in good faith, and the jury's conclusion that CNA's offer of $8000 was not in good faith is sufficiently supported by the evidence." <u>Id.</u>

Similarly, in <u>Arp</u>, we relied upon <u>Kirchoff</u> for the proposition a denial of benefits can be inferred from bad faith settlement tactics. <u>See</u> <u>Arp</u>, 300 F.3d at 918-19. Thus, the Court's conclusion Hammonds did not suffer a compensable loss as a result of Hartford's bad faith settlement tactics conflicts with the Eighth Circuit's previous

-27-

interpretation of the elements of a bad faith claim under South Dakota law. Furthermore, it matters not that the plaintiffs in <u>Kirchoff</u> and <u>Arp</u> refused the insurers' low-ball offers, while Hammonds accepted Hartford's. Under South Dakota law, Hartford could not require Hammonds to waive his potential bad faith claim when it settled the underlying claim for future attendant care benefits. <u>See</u> <u>Athey v. Farmers Ins. Exch.</u>, 234 F.3d 357, 362 (8th Cir. 2000) ("Under South Dakota law, an insurer's attempt to condition the settlement of a breach of contract claim on the release of a bad faith claim may be used as evidence of bad faith.").

I am at a loss to understand the Court's failure to address the actual loss alleged by Hammonds. Notably, even the district court was not as myopic as our Court in describing Hammonds's alleged loss, and understood Hammonds claimed the benefits Hartford denied him were reflected by the reduced value of the final settlement. <u>See</u> <u>Hammonds v. Hartford Fire Ins. Co.</u>, No. 04-5055, Order at 11 (D. S.D. Sept. 14, 2006) ("Hammonds further alleges that under such pretenses, Hartford coerced him into reducing the amount of benefits to be paid to him."); <u>see also</u> <u>id.</u> at 14 ("Hammonds argues that under this [million dollar] initiative, Hartford 'created' leverage to force him to settle.").

In addition, Hammonds's appellate brief contains numerous references reflecting the loss being claimed. <u>See, e.g.</u>, Appellant's Brief at i ("Ultimately, Hartford intimidated Hammonds into settling for a substantially reduced amount."); <u>id.</u> at 28 ("Instead of receiving $4,320.00 per month pursuant to the 1993 Agreement, Hammonds agreed to accept $ 3,500.00 in the 2003 Agreement, a savings of $369,000.00 over Hammond's (sic) life expectancy. It was a savings to Hartford of over $2,400,000.00 if, instead of the 1993 Agreement, the cost of 24 hour 7 day a week professional care is used as the basis for comparison."); <u>id.</u> at 37 ("In addition, the 'structured settlement' offered by Hartford in this case was a low ball offer of $400,000 – an offer that Hartford's Korch <u>admitted</u> constituted less than half of the attendant care currently provided, and **nothing** for future medical care of this quadriplegic.").

-28-

In sum, the loss being claimed by Hammonds was clear to everyone involved in this proceeding, except, apparently, the Court. As a result, I can only surmise the Court's need to "redefine" the alleged loss stemmed from its inability to justify affirming the grant of summary judgment if it had chosen to address the actual loss claimed by Hammond.

## III

I have not yet discussed what may be the most compelling reason why summary judgment was inappropriate in this case, and once again, it involves an issue which the Court ignores. The primary ground upon which the district court granted summary judgment was its conclusion Hammonds waived any potential bad faith claims he may have had against Hartford when he signed the 2003 Agreement. The Court chose to ignore this issue in its opinion, focusing solely on the district court's alternative ground for granting summary judgment, i.e., even if the claim was not waived, Hammonds failed to present a submissible case of bad faith. Hartford's contention that Hammonds waived his bad faith claim is significant because the very contention is evidence of bad faith under South Dakota law. An explanation follows.

The 1993 Agreement included a broad release under which Hammonds agreed to release Hartford

> from any and all additional liability for damages arising out [of] the work related injury of October 6, 1990, whether in the form of workmen's compensation benefits, *bad faith handling of workmen compensation claims*, or otherwise; it being intended by Hammonds that . . . Hartford's future liabilities and responsibilities be limited to those set forth above.

Appellant's App. 90 (emphasis added).

-29-

The 2003 Agreement generally reincorporated this provision of the 1993 Agreement in a clause which stated "[e]xcept as modified herein, the parties reaffirm and incorporate all terms and conditions of the [1993] Settlement Agreement." Addendum 23.

Throughout this litigation, both in the district court and before our court, Hartford's primary argument for dismissing Hammonds's bad faith claim is the contention he released Hartford from the bad faith claim pursuant to the 2003 Agreement's reincorporation of the bad-faith release from the 1993 Agreement. Hartford's contention is absurd and simply cannot stand.

Between 1993 and 2003, the South Dakota Supreme Court decided two cases which, when read together, conclusively demonstrate any release signed in 2003 which purports to cover the intentional tort of bad faith is invalid. See Isaac v. State Farm Mut. Auto. Ins. Co., 522 N.W.2d 752, 760 (S.D. 1994) ("[T]he tort of bad faith is an intentional tort"); Holzer v. Dakota Speedway, Inc., 610 N.W.2d 787, 793 (S.D. 2000) ("[R]eleases that are construed to cover . . . intentional torts are not valid and are against public policy." ); see also S.D. Codified Laws § 53-9-3 ("All contracts which have for their object, directly or indirectly, to exempt anyone from responsibility for his own fraud or willful injury to the person or property of another or from violation of law whether willful or negligent, are against the policy of the law."). Thus, while it *may* have been permissible to ask Hammonds to release his bad faith claims in 1993, it clearly was not permissible to do so in 2003.

More significantly, under South Dakota law, an insurer's attempt to condition settlement of a claim on the release of a bad faith claim is itself evidence of bad faith. See Isaac, 522 N.W.2d at 763; see also Athey, 234 F.3d at 362 ("Under South Dakota law, an insurer's attempt to condition the settlement of a breach of contract claim on the release of a bad faith claim may be used as evidence of bad faith.").

Thus, the mere fact Hartford reincorporated the bad-faith release of the 1993 Agreement into the 2003 Agreement, standing alone, provides Hammonds with evidence which both this court and the South Dakota Supreme Court have recognized as evidence of bad faith. The fact that Hartford has continued to insist, both in the district court and in proceedings before our court, that it had a right to request Hammonds to waive his bad faith claim, and did so in the 2003 Agreement, only makes Hartford's bad faith conduct all the more egregious. As a consequence, I find it incomprehensible for the Court nonetheless to ignore this issue in concluding summary judgment was appropriate.

## IV

For our system of jurisprudence to work properly its standards must be applied even-handedly in all cases. An appellate court must not cherry-pick the facts in a summary judgment case, but must adhere to the rule of viewing the facts in the light most favorable to the non-moving party. Nor can an appellate court misconstrue the record in order to justify an outcome, or completely ignore issues raised by the appellant which may be dispositive. I cannot allow myself to stand idly by while the Court glosses over the record so as to achieve its desired result. I therefore am respectfully compelled to dissent.

_____